# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JULY 1996 SESSION

FILED

March 5, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9311-CC-00409** |
| | ) | |
| Appellee, | ) | **HUMPHREYS COUNTY** |
| | ) | **(Nos. 10526-10527, 10544-10547,** |
| | ) | **10556-10559 Below)** |
| VS. | ) | |
| | ) | **The Honorable Allen W. Wallace** |
| **WILLIAM EUGENE HALL, JR.,** | ) | |
| **a/k/a BILLY HALL, AND** | ) | **(First-Degree Murder, Grand Larceny,** |
| **DERRICK DESMOND QUINTERO,** | ) | **Petit Larceny, and First-Degree Burglary** |
| | ) | |
| | ) | |
| Appellants. | ) | |

FOR APPELLANT HALL:

N. Reese Bagwell
The Bagwell Law Firm
116 S. Second Street
Clarksville, TN 37040

Jennifer Roberts
Littleton, Smith & Roberts
P.O. Box 396
Dickson, TN 37056

FOR APPELLANT QUINTERO:

Shipp R. Weems
District Public Defender

Steve Stack
Assistant Public Defender
23rd Judicial District
P.O. Box 160
Charlotte, TN 37036

FOR THE APPELLEE:

Charles W. Burson
Attorney General & Reporter

Darian B. Taylor (oral argument)
Assistant Attorney General

Kimberly A. Chance (appellate brief)
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0485

Dan M. Alsobrooks
District Attorney General

J. Kenneth Atkins
Assistant District Attorney General Pro Tem

James W. Kirby
Assistant District Attorney General
23rd Judicial District
P.O. Box 580
Charlotte, TN 37036

OPINION FILED: _____

**BOTH APPELLANTS' FIRST-DEGREE MURDER CONVICTIONS AND DEATH
SENTENCES AFFIRMED; BOTH APPELLANTS' FIRST-DEGREE BURGLARY AND
GRAND LARCENY CONVICTIONS AFFIRMED; BOTH APPELLANTS' PETIT LARCENY
CONVICTIONS MERGED**

**WILLIAM M. BARKER**
Judge

**O P I N I O N**

In this capital case, the appellants, William Eugene Hall and Derrick Desmond Quintero, were each convicted by a jury of two counts of murder during the perpetration of first-degree burglary, three counts of grand larceny, one count of petit larceny, and three counts of first-degree burglary. After a hearing, the jury sentenced each of the appellants to a life sentence for the murder of Buford Vester. As to the murder of Myrtle Vester, the jury found the following five aggravating factors: (1) the appellants were previously convicted of one or more felonies involving the use or threat of violence; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the appellants or another; (4) the murder was committed while the appellants were engaged in committing, or were accomplices in the commission of, or were attempting to commit, or were fleeing after committing or attempting to commit any first-degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb; and (5) the murder was committed by the appellants while they were in lawful custody or in a place of lawful confinement or during their escape from lawful custody or from a place of lawful confinement. See T.C.A. § 39-2-203(i)(2), (5), (6), (7), (8) (1982).[1] The jury found that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances and sentenced the appellants to death by electrocution for the murder of Mrs. Vester.[2]

In this appeal, the appellants raise numerous issues that challenge the sufficiency of the evidence and alleged errors occurring during the guilt and sentencing phases of the trial. Having carefully considered appellant Hall's contentions as to the sufficiency of the evidence and as to errors occurring during the guilt phase, and having decided that none has merit, we affirm appellant Hall's convictions with one modification: Count 2 of No. 10557 is merged with Count 1 of No. 10547. Having considered appellant

---

[1]T.C.A. § 39-2-203 was repealed by 1989 Tenn. Pub. Acts ch. 591 and is now codified at T.C.A. § 39-13-204.

[2]At a separate hearing, the trial court sentenced the appellants to aggregate sentences of 80 years on the other convictions, to run consecutively to the life sentences.

Hall's contentions as to the sufficiency of the evidence and as to errors occurring during the sentencing phase, and having decided that none has merit, we also affirm appellant Hall's sentence of death.

Likewise, after considering appellant Quintero's alleged errors during the guilt and sentencing phases of the trial and having decided that none has merit, we affirm appellant Quintero's convictions with one modification: Count 2 of No. 10544 is merged with Count 1 of No. 10527. Accordingly, appellant Quintero's sentence of death is likewise affirmed.


**BACKGROUND**

The state's proof introduced at the guilt phase of the trial demonstrated that early on the morning of June 16, 1988, eight men successfully escaped from the Kentucky State Penitentiary at Eddyville, Kentucky. The eight escapees included appellant Derrick Quintero, appellant William Hall, co-defendant James Blanton, Joseph Montgomery, Ronnie Hudson, Bobby Sherman, Leo Sperling, and Floyd Cook. Sherman was apprehended by Kentucky authorities the next day, and Sperling and Cook were caught on June 18. On June 22, six days after the escape, Montgomery and Hudson were captured in Taylor County, Kentucky. Appellant Hall was captured in El Paso, Texas on July 6, and appellant Quintero and co-defendant Blanton were captured in Mexico on July 10, but were not returned to the Kentucky State Penitentiary until November 14, 1989.

On the day of the escape, a 1966 Chevrolet truck was stolen from Curtis and Nina Rogers of Eddyville, Kentucky. In October 1989, the truck was finally located in a wooded area of Stewart County, Tennessee. Two round paperweights with a "Cumberland Electric" inscription were found in the bed of the truck. Mr. Rogers testified that he had never seen the paperweights before and that they, along with other items found in the truck, did not belong to him.

Shortly after the escape occurred in Eddyville, there was a rash of burglaries in the Leatherwood Resort Area in Stewart County, Tennessee, which is on the Kentucky Lake. Most of the homes in the area are summer cabins, and the full-time residents are mostly retired.

On Saturday, June 18, Jim McMinn of Clarksville, Tennessee, drove out to his cabin in the Leatherwood area to go fishing. He arrived at the cabin around noon and went fishing in his boat around 1 p.m. When he returned to his cabin around 2:30 or 3:00 p.m., he noticed a box of shotgun shells lying on the floor. He then went to his bedroom where he kept a loaded .22 caliber pistol and found it was missing. The telephone had been removed from the wall, and the phone line had been cut on the outside. When Mr. McMinn went to his truck, the windows were rolled up and the ignition had been completely destroyed. An ax was lying inside the truck, and Mr. McMinn's telephone was in the bed of the truck. Mr. McMinn walked to a neighbor's house and called the sheriff's department.

After receiving several reports of suspicious persons in the area, including a report that three men attempted to flag a car down on the road, and recognizing that the escapees might be in the area, the Stewart County Sheriff's Department conducted a four-hour search of the Leatherwood community, but none of the escapees were located. Later, Sheriff David Hicks learned from Montgomery, one of the escapees, that there had actually been three men on one side of the road and two on the other. Because the escapees became separated and could not get back together, Montgomery and Hudson had stolen a car and left the area.

On Sunday, June 19, at approximately 1:30 p.m., Essie Settles, a 74-year-old widow and resident of Dover, Tennessee, discovered that her white 1982 Ford Fairmont and some tools were missing from her garage. Subsequently, Montgomery's fingerprint was identified on the garage door. The car was located one week later at a riverbank in Marion County, Kentucky, and some of the tools were found inside the car. Hudson's fingerprint was identified on the car.

On Wednesday, June 22, the Kentucky State Police were able to apprehend Hudson and Montgomery in the area near where Mrs. Settles' car was located. During the capture, Hudson fired four shots at the pursuing officers. After Montgomery and Hudson were apprehended, Mr. McMinn's .22 caliber pistol and Neal Foster's .22 caliber pistol were found in their possession. Two live rounds were recovered from Mr. Foster's pistol and four spent shells were recovered in the area.

Hudson's brother, Michael Hudson, testified that he found Hudson and Montgomery waiting for him at his apartment in Lebannon, Kentucky, on Sunday, June 19. He testified that the two were in a white car with Tennessee plates. Michael Hudson and a friend, Robert Payne, and the two escapees went down to the riverbank, where Hudson and Montgomery hid the stolen car amongst the weeds. Michael Hudson and Robert Payne stayed with the escapees for several hours and then left. Hudson's sister, Judy Hudson, and their mother also came down to the river to see them around 6:00 or 6:30 p.m.

The next day, Judy Hudson, her two children, and Martha Grover took a suitcase of clothes to the Smith Ridge area where they met Hudson and Montgomery. They took Hudson and Montgomery to Grover's apartment, where the two escapees stayed until early Tuesday evening. None of the witnesses saw either of the appellants with Hudson and Montgomery.

On June 19, the Stewart County Sheriff's Department received two more reports of burglaries in the Leatherwood community. Alfred Cherry, of Springfield, Tennessee, testified that he and his wife owned a trailer in Leatherwood, approximately one-half mile from the Vesters' residence. In 1988, the Cherrys normally would go to their trailer once a week. On Sunday, June 19, Mr. Cherry, his wife, and two grandchildren went to the trailer around 4 p.m. They discovered the back door damaged and the trailer in disarray. The bed was unmade and appeared slept-in, wet towels were in the bathroom, and the refrigerator light switch had been taped down to prevent the light from coming on. Also, the hot water tank was turned up as high as it would go. Mr. Cherry went next door to the trailer of Thomas Harris, his brother-in-law, and discovered that it too had been burglarized.

The items missing from the Cherrys' cabin included two bedspreads, a green thermal blanket, a sleeping bag, a portable radio, approximately fifteen cassette tapes, a rechargeable flashlight, a small handsaw, six knives, coffee mugs, various canned goods, a gallon of homemade wine, two bottles of bourbon, a six-pack of beer, a toothbrush, underwear, and paperweights with the Cumberland Electric logo. Mr. Cherry positively identified the paperweights found in the Rogers' truck. Mr. Cherry also identified two

5

knives found at Mr. Foster's residence: a filet knife recovered in the living room and a knife engraved with a serial number and the name "William C. Miller." Mr. Cherry also testified that a paring knife was returned to him by the sheriff. Of the three knives never recovered, one was a filet knife with a 6 ½ or 7 inch blade, one was a knife made from a cross-cut saw with a deer horn handle and a six inch blade, and one was a Marine bayonet with an 8 ½ or 9 inch blade. Mr. Cherry estimated that the value of the properly stolen from his trailer was $600. He testified that he had not given anyone permission to stay at his cabin.

Mr. Cherry's brother-in-law, Thomas Harris, confirmed that he owned the trailer next door to Mr. Cherry. Mr. Harris also found that his back door had been pried off and that his trailer was a mess. All of the canned food was gone, the refrigerator light had been taken out, the sink was full of dirty dishes, and there was food in a skillet on the stove. Mr. Harris testified that wet towels and sheets were strewn about and cigarette burns were all over the floor. Other items missing from Mr. Harris' trailer included two quilts, silverware, butcher knives, towels, toilet articles, and a fishing tackle box. Mr. Harris testified that he had not given anyone permission to enter his trailer.

Mr. Harris' telephone bill reflected that three unauthorized calls had been placed to a number in Springtown, Texas, on Sunday, June 19, at 3:51 a.m., 8:55 a.m., and 9:19 a.m. Two unauthorized calls had also been placed to a number in Hopewell, Pennsylvania, at 4 a.m. and 9 a.m. The telephone number in Springtown, Texas, was determined to belong to a Bryan Quintero at that time. The telephone number in Hopewell, Pennsylvania, was determined to belong to Barbara Vasser, who testified that she was appellant Hall's girlfriend at the time. Ms. Vasser testified that appellant Hall told her during the first phone conversation that his parole had been denied. He would not tell her where he was, only that they were in a house and that two had been captured. He also said that they had been separated from Hudson and Montgomery. During the second conversation, appellant Hall told Ms. Vasser that they were not going back to prison.

On the evening of Monday, June 20, John Corlew and Arthur Jenkins, of Clarksville, Tennessee, arrived at the Leatherwood boat dock to do some night fishing. They launched the boat and fished in the Leatherwood Bay. Sometime between 11 p.m.

6

and 12 a.m., while the men were fishing along the north bank, they heard shots from the direction of the resort area. Mr. Corlew testified that he first heard two shots, followed by a pause, then he heard two more shots followed by a shorter pause, and then one final shot. Mr. Corlew testified that the first two shots sounded like they were from a different type weapon than the second two shots. Mr. Jenkins testified that the first two shots sounded like a pistol.

The men decided to stop fishing around 1 a.m. and wait until later that morning to go back out in the boat. Sometime after that, they saw a red pick-up truck come down to the boat dock. A man exited the truck and went to the gas pump, walked across in front of the restaurant, went around the corner, returned to his truck, and left. Upon learning about the Vester murders, Mr. Corlew contacted the Stewart County Sheriff's Department.

On Tuesday, June 21, Neal Foster, a full-time resident in the Leatherwood community, discovered that his house had been burglarized. Mr. Foster had left his home on the afternoon of June 16, and did not return until around 8:30 a.m. on Tuesday, June 21. When Mr. Foster opened his garage door, he could see that the door into the house had been broken open. He immediately threw his mail on the table and went to a neighbor's house to call the sheriff's department.

Inside, the house had been ransacked. In the kitchen, food was on the counter, deer steaks were in the microwave, and Mr. Foster's binoculars were sitting on the counter. A green ammunition box, a plastic bag full of old coins, a flashlight, and the holster for his .22 caliber RG pistol, which was recovered when Hudson and Montgomery were captured, were on the living room floor. On the floor in the hallway, Mr. Foster found a Diet Pepsi can, a pair of white tennis shoes that did not belong to him, and a laundry basket with, among other things, clothes that did not belong to him and a notebook that he had kept old coins in. Towels were strewn around the house. In the bathroom, a hunting knife, towels, a pair of socks, a .22 rifle shell box, and a 20 gauge shotgun shell were all out on the counter. The beds were messed up and had things spread on top of them. In the master bedroom, the dresser drawers were left open, and items were scattered around the bedroom, including two walkie-talkies, a hacksaw, and a 12 gauge shotgun barrel. In

7

the front bedroom, he found a couple of hats, matchbooks, a jar of marshmallow cream, a box of graham crackers, and a small drinking glass.

Mr. Foster had several guns at his house which he kept in a walk-in closet. Besides his .22 caliber pistol, he owned a Glenfield .22 caliber rifle, a Marlin .30-30 caliber lever action rifle, a 20 gauge shotgun, and a Remington Model 1100 12 gauge shotgun. His 12 gauge shotgun, which was rendered inoperable from being sawed off too closely, was found lying on his bed. The stock and barrel had both been sawed off, and the spring from the stock was lying near the gun. The 20 gauge shotgun was missing from his house; however, he identified the 20 gauge shotgun found in the Vesters' car as his. Specifically, he testified that the serial number matched, and he also showed how his full name was carved under the forearm of the gun. The barrel had also been sawed off and left in the bedroom. The .30-30 lever action rifle and .30-30 accelerator rifle bullets were also missing from Mr. Foster's house, but the rifle was never recovered. Besides the accelerator rifle bullets, Mr. Foster had .30-30 caliber rifle shells, 12 gauge shotgun shells, and 20 gauge shotgun shells, of which only a few boxes were left in the house. Coins were also missing from Mr. Foster's house, and he identified six silver dollars, recovered in Memphis, as being identical to the ones taken from his home. Mr. Foster later discovered that a pair of steel-toed safety boots and a rifle sling for the .30-30 Marlin were missing. Mr. Foster testified that he never gave anyone permission to be in his house and that the value of the property taken was $1600.

Several latent prints were found on evidence taken from the Foster residence. A latent left thumb print found on a full box of Federal 12 gauge shotgun shells was identified as belonging to appellant Quintero; a latent right ring fingerprint found on a Federal 12 gauge shotgun shell box was also identified as belonging to Quintero; a right ring fingerprint and a right middle fingerprint found on a Federal field load 12 gauge shotgun shell box were identified as belonging to co-defendant Blanton; a right palm print found on the sawed-off 12 gauge shotgun barrel was identified as belonging to appellant Quintero; and a latent right ring fingerprint found on a Diet Pepsi can was identified as belonging to appellant Hall.

8

Wayne Vester, the Vesters' son, tried to reach his parents by telephone on Tuesday, June 21. When he was unable to reach them, Wayne called Howard Allor, who lived approximately a quarter of a mile from the Vesters. Mr. Allor had last seen the Vesters on the morning of June 17, when he ate breakfast with them. When Wayne still could not reach his parents on Wednesday, June 22, he called Mr. Allor back and asked him to go check on his parents. Mr. Allor drove over to the Vesters' house, and from the kitchen area, Mr. Allor could see Mr. Vester's body. He tried to call the sheriff, but the Vesters' phone was dead. Upon leaving, Mr. Allor stopped by the home of another neighbor to see if he was all right and to relay what had happened. He then returned home and called the sheriff's department.

Wayne Vester and his 12-year-old son had visited his parents the weekend prior to the murders. They had arrived on the evening of Friday, June 17, and had left on Sunday, June 19, at about 6 p.m. They had brought groceries for his parents, including Pepsi Colas, lunch meat, bread, and milk.

Sheriff Hicks was notified of the Vester murders at approximately 1:00 or 1:30 p.m. on Wednesday, June 22. The Tennessee Bureau of Investigation (T.B.I.) conducted the primary investigation of the crime scene at the Vester residence.

The only entrance into the Vester residence was through the front screen door, which did not appear to be damaged. Along side the front walkway to the house was an unopened Pepsi can, and the packages of Pepsi Cola that Wayne Vester brought for his parents were no longer on the porch as he had left them on Sunday. The screen in the front bedroom window was missing, and the window was open. Underneath the window was a concrete block, which appeared to have been taken from in front of a shed at the back of the house. A cloth glove, matching a glove found at the Crawford residence and positively identified by Mrs. Crawford, was on the ground a short distance from the concrete block. The Vesters' maroon 1985 Pontiac Bonneville was missing. The keys to the car, which were kept on a pegboard inside the house next to the door, were also missing. The Vesters' Pontiac was valued at $5000.

Mr. and Mrs. Vesters' bedrooms were on the back side of the house. The missing window screen from the front guest bedroom was lying on the ground near Mr.

9

Vester's bedroom window. The wires to the telephone connection box outside the Vester residence had been damaged and the line was dead. A live 20 gauge Federal shotgun shell with number 6 bird shot was found lying near the electrical box. Another live 20 gauge Federal shotgun shell with number 6 bird shot was found lying between the Vester house and the shed in the back. A spent 20 gauge Federal shotgun shell casing with number 4 bird shot was found near Mr. Vester's bedroom window. The shell had been fired from the 20 gauge shotgun which was found in the Vesters' car in Memphis.

The window in Mr. Vester's bedroom was visibly bent, a portion of the glass louvers was broken, shards of glass were found on the bed, and the screen had two holes in it, indicating that Mr. Vester was shot at least once from outside the house. Mr. Vester's body was found on the floor next to his bed. The covers were drawn back and there was blood on the pillow and bed. Five shot pellets were retrieved from the room, all of which were number 5 bird shot. Two shot shell filler wads were found beside Mr. Vester's body, and a 20 gauge plastic shot wad was recovered from beside his head. Expert testimony indicated that this type wad is consistently loaded in 20 gauge shot shells and is fired from 20 gauge shotguns. A Remington 20 gauge plastic shot wad, a shot sleeve, and several shot pellets, all number 4 and number 5 bird shot, were recovered from Mr. Vester's body.

Mrs. Vester's body was found in her bedroom next to the bathroom. Mrs. Vester was shot twice with a 20 gauge shotgun, shot once with a high-powered rifle, and stabbed with a knife thirteen times. A copper-jacketed bullet was recovered from her body. The window drape in Mrs. Vester's bedroom had a hole in it, and there was a hole in the screen. The glass louvers, which were open, were not broken, indicating that the weapon was held at close range to the window. At least one shot came through the window. Police theorized that shot hit Mrs. Vester's arm and ricochetted off the heating unit cover and then went out the living room window where the plastic 20 gauge shot wad created a star-shaped hole and fell behind the coffee table. Shot was sprayed all over the house, especially the kitchen. A fibrous shot wad was also found in the kitchen. The shot pellets found in the kitchen, the living room, and Mrs. Vester's bedroom were all number 4 bird shot. All of the shot pellets found in the house were number 4 and number 5 bird shot.

Blood was found on Mrs. Vester's bed, and there was a considerable amount of blood on the bathroom floor, as well as blood splatterings on the bathtub and commode. Mrs. Vester's feet were also covered in blood.

In the living room, the Metro and State Section of <u>The Tennessean</u>, dated Monday, June 20, 1988, was lying on the sofa. In the front bedroom, where the window screen was missing, a live 20 gauge shotgun shell with number 7 ½ bird shot was found lying next to a ransacked jewelry box on the floor.

The medical examiner, Dr. Charles Harlan, testified that the Vesters died within two hours of eating dinner. He determined that three different weapons were used in the murders. Mrs. Vester's body had three gunshot wounds. Gunshot wound A was located at the right portion of the chest below the collarbone. A copper jacket entered the body at this wound and was recovered in the left arm. The wound was approximately a quarter inch in diameter and was basically round in shape. Gunshot wound B was at the upper arm. The defect measured 3.4 inches by 1.8 inches. It was jagged with an irregular edge, and there were multiple tangential abrasions associated with the wound. Gunshot wound C was at the right forearm. The two bones were severed, and the hand and wrist were attached to the body by a peninsula of soft tissue. Dr. Harlan testified that the gunshot wounds to the right arm would have been from a shotgun. He could not determine the order in which the wounds were inflicted.

Dr. Harlan further testified that Mrs. Vester's body had twelve stab wounds to the head, neck, and shoulders, and one stab wound to the middle of the back. Most of the wounds were on the left side of the head and neck and were inflicted by a squared object with a sharp edge, such as a kitchen or hunting knife. He testified that the stab wounds to the right common carotid artery, which was 90% severed, and the left common carotid artery, which was 10% severed, would have been fatal. He also testified that the gunshot wound to the right forearm would have been fatal. Based on his autopsy, Dr. Harlan determined that Mrs. Vester could have survived up to 15 minutes.

Mr. Vester's body had two gunshot wounds. The central defect from gunshot wound A was at the head and neck juncture and the total dispersal pattern of pellets was 13 inches, causing significant injury to the left lung, aorta, and pulmonary artery. Pellets

and a piece of plastic shot column were recovered. Dr. Harlan testified that this wound would have been fatal. Gunshot wound B was to the right chest at the level of the right breast. The total dispersal pattern of pellets was 6 to 8 inches, causing injury to the right lung, the diaphragm, and the liver. Dr. Harlan recovered shotgun pellets and a shot column from the chest and abdomen of Mr. Vester's body. This wound was also fatal. Dr. Harlan testified that Mr. Vester could have survived from 4 to 12 minutes.

After the Vesters' bodies were discovered, the Stewart County Sheriff's Department started checking on the homes in the surrounding area. On Thursday, the officers discovered that the Crawford residence, less than a quarter of a mile from the Vester residence, had been burglarized. John and Virginia Crawford, from Whites Creek, Tennessee, had been at their trailer from the evening of Friday, June 17, until Sunday, June 19, around 2:00 or 2:30 p.m. When they left on Sunday, everything had been clean and orderly at the trailer. The following Thursday, when the Crawfords were notified that their trailer had been burglarized, they drove to the trailer after work to find that the back door had been pried open and the kitchen was a mess. Prints were lifted from several items in the trailer. A latent left thumb print, identified as belonging to appellant Hall, was developed from the bottom of a can of ham, and a latent right index fingerprint, identified as belonging to co-defendant Blanton, was taken from a Butterfinger candy wrapper found in the refrigerator. The Crawfords identified a small brown jersey glove found at the trailer. This glove matched the patched glove found outside the Vesters' front bedroom window, which Mrs. Crawford positively identified. Although the gloves were a common type, analysis of the fibers of both gloves indicated that it was possible they were mates and originally sold together as a pair. Mr. Crawford testified that a flashlight had also been taken from the trailer, and he identified a flashlight later found in the Vesters' vehicle in Memphis as being exactly like the one taken.

Zackery Pallay, who lived in the Leatherwood Community, testified that he and the Vesters had been good friends. Mr. Pallay, who lived less than a quarter of a mile from the Vesters' house, also testified that Mrs. Vester had called on Monday, June 20, to say that they would be going to town. Mr. Pallay had previously done work at the Cherry, Harris, and Crawford residences.

12

Mr. Pallay further testified that when he learned of the escape, he called the sheriff's department to let them know that appellant Quintero knew the area and would probably come there. He testified that he had known appellant Quintero since he was 9 or 10 years old and appellant Quintero was 6 or 7 years old. They had met when appellant Quintero's father came to the Brownsfield Resort area to set up trailers for a living. Mr. Pallay testified that he and appellant Quintero would play all around the lake resort area in the woods. Although instructed not to, Mr. Pallay then testified that they had remained friends until the time "we done the armed robbery together." He said that none of the escapees ever made contact with him. Sheriff Hicks testified that both Mr. Pallay and his cousin, Chris McLean, were considered as possible suspects, but no evidence connecting them to the crimes was ever found.

On Tuesday morning, June 21, employees of the Memphis Funeral Home observed three men in a maroon Pontiac, later identified as the Vesters' car, enter the parking lot of the funeral home and park approximately 250 feet from the building. Two employees of the funeral home testified that one man got out of the front seat, took his shirt off, and put on three different shirts. The other two men also got out of the car. Although neither witness could make a positive identification[3], they testified that all three men were white; they were about the same height; two of the men were probably 180 pounds and had darker hair; and the third man had lighter, sort of brownish, hair and was lighter weight. The employees watching from the window of the funeral home testified that all three had facial hair. Another employee, who was driving the hearse in the parking lot that morning, described the three men in the Pontiac as white males. He testified that he thought one of the men had long hair and that all three had beards.

The three men were in the parking lot for approximately 5 to 8 minutes. Then, after one of them took something out of the trunk, all three men proceeded to walk towards the hospital across the street. One of the men turned around, walked back, and put something in the car. He then joined the other two men, and they walked off. It was assumed that the men were construction workers at the hospital. When the car was not picked up by Thursday, however, the employees called the Memphis Police Department.

---

[3]One funeral home employee identified co-defendant Blanton as being similar to the man who changed shirts, but he was unable to positively identify him.

13

On the morning of Thursday, June 23, the Memphis Police Crime Scene Squad responded to the call from the funeral home. They found a 1985 maroon Pontiac Bonneville matching the description of the Vesters' vehicle. The keys were in the ignition of the car, and under the floor mat behind the driver's seat, the officers recovered a sawed-off 20 gauge shotgun, identified as belonging to Mr. Foster. They also located a .30-30 caliber rifle cartridge under the floor mat, matching the ammunition taken from Mr. Foster's residence. Under one of the seats was a crumpled Budweiser beer can. Three latent prints identified as belonging to co-defendant Blanton were found on the Budweiser can. No other prints were found in the car. The officer noted that the temperatures in Memphis at that time had been extremely hot, making it difficult to lift prints. Other items retrieved from the vehicle included electrical tape, thirteen 20 gauge shotgun shells, three 12 oz. Pepsi Colas, one 12-pack of Pepsi, a portable electric air compressor, a Black & Decker car vacuum, and a brown umbrella. A flashlight exactly like the one taken from the Crawfords' residence was also found in the vehicle.

Curtis Jones, who was a security guard at the Memphis Greyhound bus station, testified that he worked Tuesdays and Wednesdays at the bus station in June of 1988. The bus station is located in downtown Memphis approximately one mile from the Memphis Funeral Home. Mr. Jones' job at the bus station was to ensure that persons who did not have business at the station were kept out. Periodically, Mr. Jones would walk around and ask people if they had bus tickets or if they were waiting for someone to arrive.

Mr. Jones testified that on Tuesday, June 21, between 11 a.m. and 1 p.m., three men came into the bus station. Two of the men sat down and began watching television, one of whom (later identified as appellant Hall) talked to a black man seated nearby. The third man, who had darker skin and appeared Hispanic, went to use the telephone. When the men failed to purchase tickets, Mr. Jones approached the two men seated and asked if they had tickets. The man, whom he identified as co-defendant Blanton, told him that they would leave as soon as their friend finished using the telephone. Altogether, the three men were in the station five to ten minutes. Later that same day, the Memphis police came by the bus station with a photographic line-up of the eight escapees. Mr. Jones responded that he had seen three men, but they had already left. Later in the

week, Mr. Jones spoke with Agent Stout of the T.B.I., and he identified co-defendant Blanton and appellant Hall from the line-up. Mr. Jones was unable to see the face of the person who was talking on the phone and could not make a positive identification. In the courtroom, Mr. Jones identified appellant Hall as one of the men at the bus station.

Agent Stout also talked with two employees at Blue Movies West, an adult bookstore and entertainment center, located across the street from the bus station. Darlene Christof, a dancer at Blue Movies West, testified that on June 21, three scruffy-looking men came into her booth. Two of the men were white and the other was Hispanic or Mexican. Ms. Christof told the men that only one was allowed in a booth, so two of the men left immediately. Ms. Christof then explained the system to the man who remained in the booth. She identified this man as number five (Quintero) in the photo line-up. Because he did not have any money, he left. Thirty minutes later, appellant Quintero returned and deposited four tokens to open the door. However, he did not have enough money for her to dance. He gave her some silver dollars and tried to sell her a class ring and a man's wedding ring.

After appellant Quintero left her booth, Ms. Christof became scared. She pretended to go to the front of the store to use the phone. In front of the three men, she asked the people working if they had heard about the three escapees from the Kentucky prison, and the men left. Ms. Christof was unable to make an in-court identification.

Shirley Denise Morrow testified that she worked as a cashier at Blue Movies West in June of 1988. On the morning of Tuesday, June 21, three men, all white except for one who appeared Mexican or of mixed decent, came into the bookstore. The men wanted to trade silver dollars and half dollars for tokens. Ms. Morrow traded some of the silver dollars and half dollars for them.

The men then went to the back of the building to see "live girl" shows. Approximately 15 - 20 minutes later, the men returned to the front of the store, and she bought some silver dollars for herself. They wanted to sell Ms. Morrow what appeared to be a class ring for $50. She suggested that they go to a pawn shop, but one of the men indicated that they could not because they did not have any identification. They then offered Ms. Morrow $50 to let them stay in the movie house until their ride came to pick

15

them up around 11 p.m.  Ms. Morrow did not agree to this.  About that time, Ms. Christof came out from the back and said something to the men.  The three men left at that point, and someone contacted the police.

Agent Stout talked with Ms. Morrow on Thursday, June 23, and showed her the photographic array of the eight escapees.  Ms. Morrow identified numbers one (Blanton), five (Quintero), and six (Hall) as the three men who came into the bookstore.[4]  Agent Stout took the six silver dollars that the men had sold to Ms. Morrow, and they were later identified by Mr. Foster as identical to the coins stolen from his residence.  Ms. Morrow also made an in-court identification of both appellants.  She testified that either appellant Hall or co-defendant Blanton had done most of the talking, but that they both looked to appellant Quintero if they said anything.

Lt. Thomas Pryor, who works at the Kentucky State Prison at Eddyville, testified that he had seen appellant Quintero within a couple of weeks of the escape.  He testified that appellant Quintero's hair was longer and his moustache came down the corners of his mouth into a goatee.  Lt. Pryor also testified that appellant Quintero had long sideburns at the time and was not wearing glasses.  Lt. Pryor had also seen appellant Hall within a couple of months of the escape.  He testified that appellant Hall's hair looked the same except for the length.  He had never seen appellant Hall with a beard.

Appellant Hall was eventually captured in El Paso, Texas, and co-defendant Blanton and appellant Quintero were captured in Mexico near El Paso.  Barbara Vasser, appellant Hall's girlfriend at the time, testified that after appellant Hall called her for a third time, her mother called the Pennsylvania State Police.  Ms. Vasser testified that she was afraid for Hall's safety, so she agreed that if Hall called again, she would set up a place and time where she could wire him money.  Appellant Hall called Ms. Vasser on July 6, and she agreed to wire him money at the Western Union in El Paso, Texas.  The Federal Bureau of Investigation was notified, and a surveillance was established at the appointed Western Union.  At approximately 2:20 p.m., Hall came into the Western Union in El Paso and was arrested.

---

[4]Interestingly, Ms. Morrow identified co-defendant Blanton as the person of mixed decent.

16

Subsequently, the F.B.I. received an anonymous tip that appellant Quintero and co-defendant Blanton were staying at a hotel in Juarez, Mexico, just across the border from El Paso. On July 10, appellant Quintero and co-defendant Blanton were apprehended at the hotel by Mexican officials and transported across the international bridge. F.B.I. agents were waiting at the border check point and took custody of the men. An old wallet with an imprint of Mr. Foster's driver's license was taken from appellant Quintero.

In order to discredit the state's case, the defense presented Mrs. Crawford's testimony that the ham can found at her house with appellant Hall's fingerprint did not belong to her and that it had to have been brought from somewhere else. Ben Spencer, an inmate at Kentucky State Prison at Eddyville, testified that he was a barber at the prison in June of 1988. He testified that he cut appellant Quintero's hair a week before the escape. Appellant Quintero wore his hair off his collar and did not have a beard at that time. Mr. Spencer also testified that he cut appellant Hall's hair right before the escape. Mr. Spencer testified that appellant Hall's hair was longer at trial than it had been when he as cutting it. He also testified that appellant Hall could not grow a beard.

By deposition, Wayne Vester, who visited his parents almost every weekend, testified that he had never met Mr. Pallay until the Vesters' bodies were discovered. Mr. Pallay, accompanied by Mr. McLean, came up to Wayne at the crime scene to express his condolences. Wayne testified that he thought it was out of the ordinary since he had never seen him before. Neither Wayne nor Mr. Allor believed that Mr. Pallay was a close friend of the Vesters. Wayne also testified that before his father retired, he was known for carrying cash around with him. Although the Vesters did not move to the Leatherwood community until after they retired, they had owned a trailer in the area for 30 years.

In order to impeach Mr. Pallay's testimony, appellant Hall entered into a stipulation with the state concerning a statement made by Mr. Pallay to Special Agent Mike Breedlove, and the trial court allowed counsel for appellant Hall to read it to the jury. The statement indicated that Mr. Pallay had known appellant Quintero since he was eight years old. His last contact with appellant Quintero had been over a year earlier. They

17

corresponded through letters. In his statement, Pallay said that he called the sheriff's department after the escape and told them that appellant Quintero would come back to this area. Mr. Pallay also told Special Agent Breedlove that appellant Quintero could go to Jessieville, Arkansas, because he had family there. Mr. Pallay said that appellant Quintero would be looking for him, but that he had not contacted him at that point. Mr. Pallay also told Special Agent Breedlove that he was not "taking up for no killer."

In rebuttal, the state presented the testimony of James Bruce, who worked at the Memphis Funeral Home. He testified that the three men had hair around the top of their collars. He also testified that all three had facial hair, although he did not know whether it was growth from several days or a beard. He also testified that he thought all three men had mustaches.

Based on the foregoing evidence, the jury found each appellant guilty of two counts of felony-murder, three counts of grand larceny, one count of petit larceny, and three counts of first-degree burglary.

At the sentencing phase of the trial, the state presented proof of the appellants' prior convictions involving the use or threat of violence. The state showed that appellant Quintero had been previously convicted in Kentucky of two charges of escape in the first degree and one charge of first-degree robbery. The state also presented proof that appellant Hall had been previously convicted of two separate assault in the second degree charges, wanton endangerment in the first degree, and aiding and abetting in threatening the life of the President and Vice-President of the United States.

Finally, the state introduced additional photographs and testimony concerning Mrs. Vester's body. Mrs. Vester was found lying in her bedroom just outside the bathroom. The state introduced photographs depicting Mrs. Vester's body, the amount of blood on the bathroom floor, and the blood on Mrs. Vester's feet.

Paul and Josey Quintero, appellant Quintero's uncle and aunt, testified that they lived in the Oak Grove, Kentucky - Clarksville, Tennessee area from about 1961 to 1972. Appellant Quintero and his family lived in Oak Grove at that time. They testified that appellant Quintero's parents drank constantly and that his father was gone for long periods of time. Appellant Quintero's mother also ran around. When Appellant Quintero would

come over to Paul and Josey Quintero's house, he would be hungry for love and affection. Paul Quintero testified that appellant Quintero was always eager to seek his approval and never gave him any trouble. At appellant Quintero's house, his parents were lenient with the kids, but would beat them when angry or drunk. Moreover, appellant Quintero never had clothes that fit him, and the other kids at school made fun of him.

Paul and Josey Quintero testified that they have tried to stay in touch with appellant Quintero since learning he was in trouble. They testified that appellant Quintero had been taking refrigeration and air conditioning classes in prison and had gotten his GED. They believed that appellant Quintero had improved himself and would make something productive of his life, even if in prison.

Paul and Josey Quintero's daughter, Angela Alva, testified that she is six years older than appellant Quintero, but that they were very close when she lived nearby. She reiterated the testimony of how appellant Quintero's parents were always drinking and partying. She also testified that appellant Quintero hung out with his older brother Roderick, who was a bad influence. Appellant Quintero was a follower, and Roderick was aggressive.

A video deposition was shown of Helen Mimms Johnson, appellant Quintero's first grade teacher. Ms. Johnson testified that appellant Quintero was mischievous but never mean. He was held back a year and had trouble being attentive in class. Appellant Quintero was never very clean and always seemed worn out when he came to school. Ms. Johnson never met appellant Quintero's parents because they never came to any parent-teacher meetings.

Finally, Angela Holland and her 15-year-old son, Roderick Kent Quintero II, testified. Ms. Holland testified that she had been married to appellant Quintero's brother for about three years. Although they have not stayed in contact with her ex-husband, she and her son have stayed in touch with appellant Quintero over the years. Both testified that appellant Quintero has been influential in helping his nephew stay out of trouble.

Robert Hall, appellant Hall's oldest brother, testified. Robert, currently a prison minister, testified that appellant Hall was born in Paducah, Kentucky. Their parents divorced when appellant Hall was two years old. Their father was gone for extended

19

periods of time because he worked on a barge. Their mother died of throat cancer when appellant Hall was four. After his mother's death, appellant Hall went to live with his father and step-mother, who was addicted to codeine and to heroine at one time. Robert testified that the four children were never disciplined or taught right from wrong but would sometimes be beaten for getting in trouble.

Appellant Hall started getting in trouble when he was in grade school. In his pre-teens, he started drinking, and started taking drugs in his early twenties. Robert testified that appellant Hall was a follower.

In 1982, appellant Hall was paroled to Pennsylvania to live with Robert Hall and his wife, Ester. Appellant Hall worked with Robert at a tire shop and went to church with Robert and Ester. When appellant Hall turned to God, there was a big change in his life. Appellant Hall stayed with Robert and Ester for eight months, but after appellant Hall went to live in a trailer near where he worked, he started drinking and eventually returned to Kentucky. The last time Robert and Ester saw appellant Hall was at his step-mother's funeral in 1987; however, they talk to appellant Hall on the phone weekly.

Barbara Vasser met appellant Hall when he came to live with his brother. She also testified about the change in his life after accepting Christ. She and appellant Hall were engaged, but never set a date because Ms. Vasser was only 17 years old at the time. Ms. Vasser testified that she and appellant Hall were friends off and on between 1982 and 1988. After his recapture, Ms. Vasser did not have any contact with appellant Hall. She turned appellant Hall in because she was afraid he would get hurt.

Dr. Kenneth Anchor, an associate professor of psychology at Vanderbilt and a clinical psychologist, testified that he prepared a psychological evaluation of appellant Hall on August 17, 1991. He testified as to the background information that appellant Hall gave him during the interview. Appellant Hall grew up in Paducah. His formal education ended after the ninth grade, but he earned his GED in prison. Appellant Hall began using drugs and alcohol at age 11, and he was addicted to Valium by age 14. He was placed in juvenile detention at various times and was sent to a youth development center. As a young adult, appellant Hall worked different jobs. However, since the age of 17, he has mostly been in and out of prison. Appellant Hall told Dr. Anchor that he had experienced

20

two head injuries. He fell off a porch as a baby, and at 14, he was struck in the head with a baseball bat.

Dr. Anchor testified that appellant Hall was cooperative and responsive during the interview. Appellant Hall did not offer any excuses or try to blame others. There was no indication of malingering. Moreover, appellant Hall was enthusiastic about his plans to pursue college courses in computers and data processing.

Appellant Hall scored a 99 on his I.Q. test, putting him in the 48 percentile. Dr. Anchor testified that although appellant Hall has a reasonable amount of intelligence, he has some difficulties using it. Hall experiences cognitive interference which is frequently seen in people who have done a lot of drinking and habitually used drugs. Dr. Anchor found Hall's judgment, reasoning, and problem solving skills to be unstable. Dr. Anchor found that this was consistent with one who has had a head injury and a history of substance or polysubstance (use of more than one substance) abuse.

Based on testing and interviewing appellant Hall, Dr. Anchor concluded that appellant Hall is seriously maladjusted and suffers from organic personality syndrome. Persons with similar test profiles have a deep-seated sense of worthlessness and inferiority, and appellant Hall feels a deep sense of shame, embarrassment, and humiliation for many of his past actions. It was Dr. Anchor's opinion that Hall's psychological maladjustment could be effectively treated with counseling or psycho-therapy. At the time of trial, Dr. Anchor stated that Hall did not present a danger either to himself or to others in a prison setting. He felt that the prognosis was good if appellant Hall remained free of future substance abuse. He also felt there were prospects for satisfactory social, educational, and vocational functioning and adjustment.

In rebuttal, the state presented the testimony of Dr. Samuel Craddock, a clinical psychologist at Middle Tennessee Mental Heath Institute, who also interviewed appellant Hall but did not perform any tests. Based on his interview with appellant Hall and his review of appellant Hall's records, Dr. Craddock disagreed with Dr. Anchor as to the degree of danger appellant Hall poses. He also testified that he had not seen any data to support a finding that appellant Hall had an organic personality syndrome.

21

Based on this proof, the jury sentenced the appellants to death for the murder of Myrtle Vester and to life imprisonment for the murder of Buford Vester.

### SUFFICIENCY OF THE EVIDENCE[5]

The appellants contend that the evidence did not support any of the multiple convictions. They argue that had they been tried on each charge individually, they would have been acquitted of all charges. The state submits that while the evidence presented in this case was entirely circumstantial, given the remote location of the victimized community and the manner in which the appellants acted, it proved beyond a reasonable doubt the commission of each crime. We find that the evidence is sufficient to support the verdicts.

A guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves any conflicts in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after a consideration of the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983), cert. denied, 465 U.S. 1073, 104 S.Ct. 1429, 79 L. Ed. 2d 753 (1984); Tenn. R. App. P. 13(e).

A crime may be established by direct evidence, circumstantial evidence, or a combination of the two. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 225 Tenn. (3 Pack) 478, 482, 470 S.W.2d 610, 612

---

[5]While appellant Hall challenges the trial court's failure to dismiss the charges as the thirteenth juror, this issue has been waived by his failure to cite any authority in support of his arguments as required by Tenn. R. App. P. 27(a)(7) and Tenn. Ct. Crim. App. R. 10(b).

(1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. at 484, 470 S.W.2d at 613.

While the appellants were charged as principals on all counts, the jury was charged on aiding and abetting. State v. Hensley, 656 S.W.2d 410, 413 (Tenn. Crim. App. 1983). Under the pre-1989 Code, one could be considered an aider and abettor if one advised, counseled, procured, or engaged another to commit a crime. Flippen v. State, 211 Tenn. (15 McCanless) 507, 514, 365 S.W.2d 895, 899 (1963). A particular act or even physical participation in the commission of the crime is not necessary. The appellant need only to have been "constructively" present. State v. McBee, 644 S.W.2d 425, 428-30 (Tenn. Crim. App. 1982); State v. Lequire, 634 S.W.2d 608, 613 (Tenn. Crim. App. 1981).

Even if the evidence is circumstantial, there must be proof that the aider and abettor associated himself with the venture, acted with the knowledge that an offense was to be committed, and shared the principal's criminal intent. Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976). Intent may be inferred from the circumstances surrounding the crime. Presley v. State, 161 Tenn. (8 Smith) 310, 315-17, 30 S.W.2d 231, 233 (1930). While mere presence is not sufficient to conclude that a defendant aided and abetted in a crime, presence, companionship, and conduct before and after the criminal event are all proper considerations. State v. McBee, 644 S.W.2d 425, 428.

In short, the state's theory in this case was that these crimes were inextricably intertwined. The evidence showed that all of the burglaries occurred within a 2-mile radius and were committed between June 16 and June 21, 1988. Two knives taken from the Cherry residence were found at the Foster residence. Three knives from the Cherry residence were never recovered. At the Harris residence (next door to the Cherrys'), phone calls were made within that time period to appellant Hall's former girlfriend in Pennsylvania and to a Bryan Quintero in Texas.[6] At the Crawford residence, appellant Hall's fingerprint was found on a ham can that was sitting on the table. Other items from the Crawfords' house were connected to the appellants at the Vester crime scene.

---

[6]Zackery Pallay testified at trial that appellant Quintero had a younger brother named Bryan.

Moreover, at the Foster residence, appellant Quintero's fingerprints were found on a Federal 12 gauge shotgun shell box, and his palm print was found on the barrel of a 12 gauge sawed-off shotgun. Appellant Hall's fingerprint was found on a Diet Pepsi can at Mr. Foster's house. At the Vester residence, ammunition similar to that taken from the Foster residence was found, including three live Federal 20 gauge shotgun shells and one casing. Pellets and shot wads removed from the residence and the victims' bodies were also consistent with the ammunition stolen from the Foster residence. Although not recovered, Mr. Foster testified that a .30-30 caliber rifle was stolen from his house. There was testimony that one of Mrs. Vester's gunshot wounds was consistent with having come from such a weapon. Also, a glove, belonging to (and positively identified by) Mrs. Crawford, was found outside the Vesters' front window.

The proof also connected the appellants to the Vesters' 1985 maroon Pontiac Bonneville which was later recovered in Memphis. In the car, the police found a sawed-off 20 gauge shotgun, which was positively identified by Mr. Foster. T.B.I. Agent Don Carmon identified this shotgun as having fired the spent 20 gauge shotgun shell found outside Mr. Vester's bedroom window. The Crawfords also testified that the flashlight found in the vehicle was exactly like the one taken from their home. Finally, three eyewitnesses saw similar looking men get out of the Vesters' vehicle at the Memphis Funeral Home. Then, an eyewitness placed appellant Quintero in Memphis at the time the Vesters' vehicle was abandoned. Two eyewitnesses also placed appellant Hall in Memphis at that time.

Based on the evidence in the record, albeit circumstantial, we find that a rational jury could have found the evidence sufficient to support the appellants' multiple convictions with one exception. We find that the evidence does not support dual convictions dealing with the larcenies of personal property belonging to the Vesters. The record does not indicate that the larcenies occurred at separate times, and, thus, the appellants' petit larceny counts for property taken from the Vesters must be merged with the grand larceny counts for the vehicle taken from the Vesters. See Greer v. State, 539 S.W.2d 855, 858 (Tenn. Crim. App. 1976).

## EXCLUSION OF JURORS

24

The appellants argue that the trial court incorrectly excused potential jurors because of their inability to impose the death penalty based on their religious beliefs.[7] Specifically, the appellants claim that the trial court's dismissal of these potential jurors constituted a religious test in violation of Article I, § 4 of the Tennessee Constitution, which states that "no political or religious test, other than an oath to support the Constitution of the United States and this State, shall ever be required as a qualification to any officer or public trust under this State." The appellants also claim that the excusing of these jurors violated the juror's right to serve on a jury as guaranteed by Article I, § 3 of the Tennessee Constitution, which states that "no human authority can, in any case whatever, control or interfere with the rights of conscience."

The trial court's findings on this issue are to be given a presumption of correctness. State v. Harris, 839 S.W.2d 54, 64 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L. Ed. 2d 746 (1993). Therefore, the burden rests on the appellants to establish by convincing evidence that the trial court's determination was erroneous. Id. Here, we find that the trial court properly excluded those jurors who indicated they would be unable to follow the law during the sentencing phase. The appellants have not shown, nor does the record reflect, that the trial court abused its discretion in excluding these jurors.

In determining whether to exclude a juror, the trial court must decide whether a prospective juror may be excluded for cause because of his or her views on capital punishment when those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L. Ed. 2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L. Ed. 2d 581 (1980)). The trial court may permissively excuse jurors in capital cases "because their views on capital punishment render[ed} them unable to follow the law as given to them by the court and to perform their

---

[7] The following jurors were challenged and excused: Patricia Matthews, Juanita Cannon, Mickie Miller, Clyde E. Capps, Gerald Bowker, Wayne Purcell, Gladys Hooper, J. B. Bradberry, Martha Beasley, Charles Daniel, Barry Bronson, Carol Cochran, David E. Buchanan, Herschel Ross, Clarence Humphrey, and Carl Brazzle. The record reflects that while some of the excluded jurors indicated there were other considerations in refusing to impose the death penalty, all admitted that religious beliefs played a part in their decision.

duties as jurors in accord with their oaths." State v. Bobo, 727 S.W.2d 945, 949 (Tenn.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L. Ed. 2d 155 (1987).

In Bobo, our Supreme Court specifically held that just because a prospective juror's "views on capital punishment may have had a religious foundation does not necessarily transform the tests mandated by the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L. Ed. 2d 776 (1968), and Wainwright v. Witt, supra, into religious tests for the purposes of the Tennessee Constitution." 727 S.W.2d at 949. Similarly, in State v. Jones, 789 S.W.2d 545 (Tenn.), cert. denied, 498 U.S. 908, 111 S.Ct. 280, 112 L. Ed. 2d 234 (1990), our Supreme Court held that the dismissal of prospective jurors who could not impose the death penalty because of their religious beliefs does not constitute an impermissible religious test because their views on capital punishment rendered them unable to follow the law as given to them by the court and to perform their duties as jurors in accord with their oath. Id. at 547. Finally, in State v. Johnson, 762 S.W.2d 110 (Tenn. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1559, 103 L. Ed. 2d 862 (1989), our Supreme Court held that potential jurors who admitted they could not impose the death penalty could be permissively excused because their views would prevent them from applying the law concerning the death penalty. Id. at 114.

Because it is undisputed that the challenged jurors each stated that they could never impose the death penalty, these potential jurors would not have been able to render an unbiased decision. Therefore, the trial court correctly excused these jurors. This issue is without merit.


## ADMINISTRATION OF OATH TO LESS THAN TWELVE JURORS

The appellants argue that the trial court abused its discretion by removing a juror who refused to take the oath when it was administered and by replacing that juror with the first alternate. The appellants contend that the swearing-in of eleven rather than twelve jurors violated T.C.A. § 40-18-106 and that the trial court's removal of the juror because she did not say the oath nor wanted to serve on the jury was an arbitrary discharge of a duly selected juror. In addition, appellant Quintero claims that the seating of the first

alternate by the trial court denied him the right to exercise his remaining peremptory challenges. We disagree.

On November 7, 1991, after voir dire examination, a jury of twelve individuals and two alternates was selected by the parties. At the conclusion of this process, defense counsel requested that the twelve jurors be sworn in, but the trial court refused to do so. The next day, a third alternate was selected, and the twelve jurors and three alternates were sworn in. The trial court then questioned one of the jurors because she did not acknowledge the oath when it was administered. The juror stated that she would be more sympathetic to the witnesses who had "lost somebody at the hand of someone else" rather than towards the appellants. The trial court subsequently concluded that the juror did not want to serve.

When the trial court asked counsel for suggestions, counsel for appellant Quintero requested that jury selection be reopened since he had three preemptory challenges left. Counsel for appellant Hall and the state recommended that the first alternate be placed on the jury. Counsel for appellant Quintero again objected, and counsel for appellant Hall joined in the objection. The trial court removed the juror and replaced her with the first alternate.

Although we find this issue to be without merit, we first note that any complaint as to the trial court's actions in this matter has been waived by appellant Hall, who initially recommended the taken course of action. A party responsible for an error cannot seek relief from the recommended course of action on appeal. See Tenn. R. App. P. 36(a).

T.C.A. § 40-18-106 states that "[i]n impaneling a jury for the trial of any felony, the court shall not swear any of the jurors until the whole number are selected for a jury." Under the statute, all twelve jurors must be selected at the time that the jurors are sworn in. Here, twelve jurors were selected and sworn in, however, one juror refused to take the oath.

In Tennessee, the trial court has wide discretion in examining prospective jurors and ruling on their qualifications. State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339, 127 L. Ed. 2d 687 (1994). It is also

27

within the discretion of the trial judge to seat an alternate who had been selected by the parties when a regular juror must be removed. Tenn. R. Crim. P. 24(e)(1); State v. Millbrooks, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991). Under the circumstances of this case, we find that the trial court did not abuse its discretion in removing the juror and filling the opening with the first alternate, especially since the juror was excused in part because of her admitted bias against the appellants. Moreover, the appellants have failed to show that the actual jury was impartial, making any potential error harmless.


## VENUE

Appellant Quintero contends that the trial court's order changing venue the second time, from Cheatham County to Humphreys County, was in violation of Article I, § 9 of the Tennessee Constitution and of Tenn. R. Crim. P. 21. Specifically, appellant Quintero argues that he did not consent to the change of venue, and even if this Court determines that he acquiesced in the change, there was no finding by the trial court that there existed undue excitement within Cheatham County to justify the removal of this case. Moreover, appellant Quintero submits that Humphreys County is not the nearest county in the judicial district in which the prosecution was pending, as required by Tenn. R. Crim. P. 21(c).

All of the alleged crimes occurred in Stewart County where presentments were brought against the appellants and co-defendant Blanton. Pursuant to Tenn. R. Crim. P. 21, motions, supported by affidavits, were filed by the appellants, and the trial court changed venue to Cheatham County. Subsequently, the trial court severed co-defendant Blanton's trial from that of the appellants. After co-defendant Blanton was tried in Cheatham County, the appellants filed motions for change of venue, however, the motions were not supported by affidavits. At a hearing on the motions, the state opposed the motions because there were no supporting affidavits as required by Rule 21(b). Although Appellant Quintero withdrew his motion at that time, appellant Hall did not. There was some discussion of the issue, and counsel for appellant Quintero made the following statement concerning Cheatham County:

> Your Honor, I concur with that. If the General wants to try it here, we can spend a month trying to get a jury here. The General knows, as well as everybody else knows, we can't get a jury here. But if the General wants to try it, that's fine with us.

After further discussion, the issue was reserved until the end of the hearing. Under the impression that he had withdrawn his motion for change of venue, counsel for appellant Quintero left the courtroom as counsel for appellant Hall argued his motion for change of venue. Counsel was called back into the courtroom, and the issue was again discussed. Abruptly during the hearing, the trial court changed venue to Humphreys County. The trial court stated "I'm just going to do it. If I'm in error, I'm in error." Appellant Quintero did not make any objections at that time.

Subsequently, an order was entered by the trial court allowing appellant Quintero to withdraw his motion for a change of venue and finding that the motion was of no effect. That same day, appellant Quintero filed a motion requesting that the trial be prosecuted in Stewart County, where the alleged offenses were committed. Appellant Quintero also filed a motion objecting to the change of venue to Humphreys County. A motion hearing was held that day, and the trial court upheld its earlier decision to change venue to Humphreys County.

After the trial was completed, the court entered an order denying appellant Quintero's motions. The order stated in part:

> Upon consideration of all matters presented and argument of counsel for the defendant and the State, the Court finds that the defendant's Motion is not well taken. The Court finds that this defendant filed for and was granted a change of venue on or about January 14, 1991, that venue was moved to Cheatham County, Tennessee, and that the defendant filed an additional request objecting to that venue and that the Court considering all matters presented moved the venue of this case to Humphreys County, Tennessee, on August 30, 1991. The Court would further note and find that counsel for the defendant has attempted to withdraw the defendant's request for a change of venue which was denied by the Court on August 30, 1991. An order was previously entered in this Court on the 7th day of Oct., 1991, which was signed by the Court in error. That Order as it appears in Minute Book 92, page 304, is void.

Rule 21(a) provides that "[i]n all criminal prosecutions the venue may be changed upon motion of the defendant, or upon the court's own motion with the consent of the defendant, if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Venue is jurisdictional in Tennessee. An accused has the right to be tried in the county in which the crime has been committed. See Article 1, § 9 of the Tennessee Constitution.

29

After reviewing the record, we find that appellant Quintero waived any constitutional or procedural complaint as to venue. Initially, appellant Quintero failed to contemporaneously object to the trial court's ruling. See Tenn. R. App. P. 36(a). Moreover, while appellant Quintero withdrew, or attempted to withdraw his motion for change of venue from Cheatham County, he did not make any objection to the trial court's ruling until he subsequently filed a motion approximately one month later. It also appears that appellant Quintero waived any constitutional argument on this issue when he made his initial request that venue be changed from Stewart County.

In State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), the appellant filed a pretrial motion for change of venue. The trial court granted the motion and moved the trial to another county, over the appellant's objection, for the limited purpose of selecting an unbiased jury. Once the jury was selected, the trial was transferred back to the original county. The appellant then raised this issue on appeal, characterizing it as "two changes of venue." Id. at 727. In reviewing the appellant's claim, the Supreme Court held:

> Our Tennessee Constitution obviously reflects similar concerns and values. The dispositive question here is whether the defendant waived his rights under Article I, § 9, as to both venue and vicinage when he moved for a change of venue. We conclude that the change of venue motion constitutes a waiver of Article I, § 9, rights. Accordingly, unless the defendant is prejudiced, the administration of justice harmed, or the trial court abuses its discretion, no reversible error occurs when a trial court judge employs the unorthodox procedure used in this case in response to a defendant's motion for a change of venue.

Id. at 728.

Based on this holding, appellant Quintero waived any constitutional complaint to the second change of venue. Moreover, the record does not reflect that appellant Quintero was prejudiced, that the administration of justice was harmed, or that the trial court abused its discretion. Here, both appellants admitted at the hearing on the change of venue from Cheatham County that they would not be able to pick an unbiased jury after co-defendant Blanton had been tried in that county.

Finally, appellant Quintero does not have a claim under Rule 21, which only confers procedural rights upon a defendant. In State v. Smith, 906 S.W.2d 6 (Tenn. Crim. App. 1995),[8] this Court held that when venue was changed to a different county, the

---

[8]In Smith, the appellant was granted an extraordinary appeal pursuant to Tenn. R. App. P. 10.

appellant was entitled to protections similar to those he had in the original county under Rule 21. Id. at 10. The Court determined that on remand for resentencing, the trial court erred in granting a motion for change of venue over the objection of the appellant. Basing its decision on Rule 21, the Court stated:

> [R]egardless of whether the defendant or the trial court, with the defendant's consent, moves for a change of venue, the threshold determination to be made is whether, in fact, cause exists to conclude that a fair trial probably cannot be had. Rule 21 contemplates that such a showing be made of record. See, e.g., Rule 21(a) and (b).

Id.

Unlike in Smith, appellant Quintero waived any rights under Rule 21 by waiting to raise this issue now. Accordingly, while appellant Quintero may have been able to raise a claim under Rule 21 if he had pursued an interlocutory or extraordinary appeal pursuant to Tenn. R. App. P. 9 or 10, such is not available to appellant Quintero at this juncture. Moreover, by statements made to the trial court by appellant Quintero's counsel, it was clear that a fair trial could not have been had in Cheatham County. See Smith, 906 S.W.2d at 10. Finding that any constitutional or procedural claim has been waived, we affirm the trial court's decision to remove the case from Cheatham County.

**CONSOLIDATION OF PRESENTMENTS**

The appellants contend that the trial court erred in granting the state's pre-trial motion to consolidate the presentments in this case pursuant to Tenn. R. Crim. P. 8(b). Specifically, the appellants assert that the evidence does not support a finding of a common scheme or plan and, furthermore, that the evidence of all of the cases on trial would not have been admissible upon the trial of all the others.

Under Tenn. R. Crim. P. 13(a), a "court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all appellants could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Tenn. R. Crim. P. 8(b) provides:

> Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character.

31

Based on the facts and on argument of counsel, the trial court granted the state's motion to consolidate the presentments in this case. Subsequently, several motions to sever were filed by the appellants and denied by the trial court.

The decision to consolidate separate indictments is a procedural matter which is within the discretion of the trial court. McCook v. State, 555 S.W.2d 411, 412 (Tenn. Crim. App.1977). Having consolidated the offenses pursuant to Rule 8(b), the appropriate standard for evaluating whether a severance should be granted is Rule 14(b)(1). The appellants have a right to severance "unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). Both portions of the rule must be satisfied to avoid severance: there must be a common scheme or plan and the evidence of one offense must be admissible at the trial of the others.

In determining whether or not to grant a severance, the trial court must look at "the facts and circumstances involved in the various crimes that are charged." State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990). The decision to grant a severance is left to the sound discretion of the trial court, State v. Furlough, 797 S.W.2d 631, 642 (Tenn. Crim. App. 1990), and will not be disturbed unless the defendant is unfairly or unduly prejudiced. See Woodruff v. State, 164 Tenn. (11 Smith) 530, 539, 51 S.W.2d 843, 845 (1932); State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). It is the responsibility of the defendant to show that he was clearly prejudiced by the trial court's refusal to sever the offenses. See State v. Hodgkinson, 778 S.W.2d 54, 61 (Tenn. Crim. App. 1989).

Common scheme or plan encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose as well as crimes which occur within a single criminal action. State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). In the present case, the various crimes and the sequence of their occurrence were part of a greater plan to leave the country and to avoid capture by the Kentucky authorities; thus, establishing the first prong under Rule 14(b). All of the crimes for which the appellants were charged occurred in the Leatherwood community of Stewart County within less than a week. Key pieces of evidence found at the murder scene and in the

32

Vesters' stolen car linked the appellants to the burglaries and thefts from the Cherry, Foster, and Vester residences; and evidence of the burglaries and thefts from the Foster, Cherry, and Vester residences aided in establishing the appellants' opportunity, motive, and intent to kill the Vesters. Further, evidence of the uncharged crimes at the McMinn, Harris, and Crawford residences helped to establish the appellants' common scheme to escape from the Kentucky authorities. See State v. Wooden, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983).

Moreover, we find that the second prong has been met. In making this determination, we have looked to the Tennessee Rules of Evidence; specifically, Rule 404(b). See State v. Hallock, 875 S.W.2d at 290-92. The "admission of evidence of other crimes which tends to show a common scheme or plan is proper to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue." Id. at 92. There is no doubt that in this case, the proof of each offense was inextricably connected with the evidence of the other offenses. In such cases, the Supreme Court has held that the denial of a motion to sever the offenses is not error. See State v. Shepherd, 902 S.W.2d 895, 903-904 (Tenn. 1995). This issue is without merit.

## INTRODUCTION OF TELEPHONE RECORDS

At trial, an AT&T telephone bill was introduced into evidence through Thomas Harris. He testified that the bill reflected phone calls made from his trailer in the Leatherwood area on June 19, 1988. The bill itself showed that three long distance calls were made to a phone number in Springtown, Texas. Mr. Harris testified that he did not place the calls. Later, Jerry Henderson, the records custodian for GTE telephone company in Dallas, Texas, testified that the phone number had been listed in the name of Bryan Quintero at the time of the calls.

Appellant Quintero argues that the initial recitation from Mr. Harris' AT&T telephone bill was hearsay and constituted a violation of his Sixth Amendment right to confront witnesses. He further argues that the evidence did not bear its own indicia of

33

reliability, and therefore the state was required to secure the presence of the custodian of records for AT&T. We disagree.

In State v. Meeks, 867 S.W.2d 361 (Tenn. Crim. App. 1993), this Court held that computer generated records are not hearsay:

> The role that the hearsay rule plays in limiting the fact finder's consideration to reliable evidence received from witnesses who are under oath and subject to cross-examination has no application to the computer generated record in this case. Instead, the admissibility of the computer tracing system record should be measured by the reliability of the system, itself, relative to its proper functioning and accuracy. See, e.g., Penny v. Commonwealth, 6 Va.App. 494, 370 S.E.2d 314, 316-317 (1988); People v. Holowko, 109 Ill.2d 187, 93 Ill.Dec. 344, 346, 486 N.E.2d 877, 879 (1985). In this case, the record reflects that persons with special knowledge about the operation of the computer system gave evidence about the accuracy and reliability of the computer tracing so as to justify the admission of the computer printouts. The rule against hearsay is not implicated.

Id. at 376. In Meeks, persons with special knowledge about the operation of the computer system testified as to the system's accuracy and reliability. Here, the state did not present the testimony of an AT&T records custodian, but there was testimony from Mr. Henderson, an employee from the Texas phone company. He testified that AT&T's billing system is highly reliable and that all local phone companies doing business with AT&T have the exact same billing system. Mr. Henderson testified extensively, and we find that his testimony was sufficient to confirm the reliability of the telephone bill under Meeks.


**TESTIMONY OF PRIOR CRIMES**

Appellant Quintero argues that the trial court erred by failing to grant a mistrial after Zackery Pallay testified that he and Quintero had "done the armed robbery together." He contends that due to the similarities of the crime of armed robbery and the charges in this case, the mention of the armed robbery was devastating. We hold that the trial court properly denied appellant Quintero's request for a mistrial.

At a jury-out hearing, the trial court made the following ruling concerning the testimony of Mr. Pallay, a witness for the prosecution:

> All right. Gentlemen, I'm going to rule that this witness is not to testify about the armed robbery conviction and the reason being is this, let me go back a little bit. He has known Mr. Quintero since they were youngsters. He will testify that he was -- I'm sure the reason of this evidence that him and his father used to set up trailers in the Leatherwood area, Mr. Quintero and his father, so that puts Mr. Quintero familiar with the Leatherwood area, so that cuts down on the probative value of what else you're trying to get to.

34

That is, that you can prove by this testimony that Mr. Quintero was familiar with the Leatherwood area, so that cuts down on that probative value of what was even said later on when they were in prison, number one. And number two, is the prejudicial effect certainly in that case then would outweigh the probative value, so do not state that they were in prison, period.

Shortly into his testimony, Mr. Pallay stated that he and appellant Quintero had been close friends "[u]p until the time we done the armed robbery together." The trial court, sua sponte, instructed the jury to "strike that last statement, disregard that completely." A jury-out hearing was then held where appellant Quintero requested a mistrial, which the trial court denied.

Whether to grant a mistrial lies in the discretion of the trial judge. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). A mistrial should be declared in a criminal case only in the event of a "manifest necessity" that requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). The trial court's determination will not be overturned on appeal unless it is shown that the trial court abused its discretion. State v. Adkins, 786 S.W.2d 642, 644; see State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993).

In the present case, the jury was already aware that appellant Quintero was an escaped convict. Moreover, Sheriff Hicks had already testified that appellant Quintero and Mr. Pallay had served time together at Eddyville. While this testimony came out when counsel for appellant Hall was cross-examining Sheriff Hicks, there was no objection by appellant Quintero. More importantly, the trial court gave a curative instruction which the jury is presumed to have followed. Frazier v. State, 566 S.W.2d 545, 551 (Tenn. Crim. App. 1977). While Mr. Pallay should not have testified that he and appellant Quintero had previously committed an armed robbery together, we do not find that the statement, by itself, required the trial court to grant a mistrial.

## IMPEACHMENT OF WITNESS

The appellants contend that the trial court erred by not allowing them to impeach the testimony of the state's witness, Mr. Pallay, after they learned that he had committed perjury during the jury-out hearing. Specifically, they contend that the trial court erred by not allowing them to present testimony and certified copies of warrants issued against the witness. The appellants further argue that it was prosecutorial misconduct for the prosecutor to neglect to bring it to the attention of the trial court when he was aware of the misrepresentation. Accordingly, the appellants request a new trial.

The questioned jury-out testimony was as follows:

Q. Mr. Pallay, do you have any convictions other than armed robbery?

A. Other than an armed robbery, bad check law, that would be about it, that's all I can recall.

Q. Would that be felonies or misdemeanors?

A. It was all settled out of court.

Q. When did those occur?

A. Back when I was eighteen years old, eighteen and nineteen years old.

THE COURT: No, I'm not going to let you do that now. That wasn't in. Anything since the armed robbery conviction?

A. No, sir, not to my recall.

THE COURT: All right.

Q. Have you had any arrests since you were released?

A. I can't recall if I have or not. I can't recall. I'm sorry, you know.

Q. That's fair enough, I suppose. One thing let me clarify a little bit, were you ever violated for parole or anything, had to go back in and do more time, then paroled again?

A. No, sir. The day I was released from parole, I have been clean since except for one time I was over at a person's house which he was busted for marijuana. I was not charged in anything on that charge in Jackson, Tennessee.

When the jury returned, Mr. Pallay testified on direct that he had previously been convicted of armed robbery.

36

Later in the proceedings, Sheriff Ronnie Toungette testified at a jury-out hearing that he was in the courtroom when Mr. Pallay testified. Sheriff Toungette testified that when he heard Mr. Pallay's testimony, he realized that he had previously arrested Mr. Pallay, so he checked some records at his office. The appellants sought to introduce three certified copies of arrest warrants, including one for perjury. During argument on this matter, the prosecutor stated:

> I was aware of this circumstance and would have -- and if Counsel had gone into it, we would have -- and the Court had allowed him, we would have given the opportunity to explain. The witness told me about some run-in that he had on misdemeanor charges here in Humphreys' County Court. But, when -- he wasn't questioned about it and there wasn't no requirement for me to do that. But it's just improper, it's collateral. The witness was never given an opportunity -- he was never asked about it.

The trial court did not allow the appellants to present the warrants or the testimony of Sheriff Toungette to the jury. The appellants were given the opportunity to subpoena Mr. Pallay, but he was never recalled.

When Mr. Pallay testified that "I have been clean" since the day he was released from parole, he clearly testified falsely. Moreover, the prosecutor stated during the discussion of this matter that Mr. Pallay had told him about some prior "run-ins," indicating that Mr. Pallay did in fact recall the subsequent arrest warrants.

Tenn. R. Evid. 608(b) states:

> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified.

Under Rule 608(b), extrinsic proof of Mr. Pallay's prior arrests would not be admissible in court. The appropriate avenue was to issue a subpoena for Mr. Pallay, request a jury-out hearing pursuant to Rule 608(b)(1), and attempt to cross-examine him about his prior arrest for perjury. Because the appellants failed to avail themselves of this remedy, as offered by the trial court, any error was waived. Tenn. R. App. P. 36(a).

Finally, the prosecutor's failure to reveal that the state's witness was being untruthful, regardless of whether the questioning was proper, is troubling. A prosecutor has both a legal and ethical duty to correct the false testimony of a prosecution witness.

State v. Spurlock, 874 S.W.2d 602, 612 (Tenn. Crim. App. 1993). Nevertheless, the appellants had an opportunity to correct any error and waived the issue by failing to do so. Tenn. R. App. P. 36(a).

## RIGHT TO CONFRONT WITNESSES

Appellant Quintero argues that his right to confront witnesses, guaranteed by the Sixth Amendment to the United States Constitution and by Article 1, § 9 of the Tennessee Constitution, was violated when the trial court allowed the reading of Mr. Pallay's unsworn statement to the jury.

As part of appellant Hall's proof, the trial court allowed appellant Hall and the state to enter into a stipulation that Pallay's unsworn, ex parte statement was taken by T.B.I. Special Agent Mike Breedlove during the investigation of the case. Over the objection of appellant Quintero, counsel for appellant Hall was allowed to read Mr. Pallay's statement, as recorded by Special Agent Breedlove, to the jury:

> I have known Quintero since I was eight years old. The last contact I had with him was a year ago. I would correspond with him through letters. I called the Sheriff's Department the day after the escape and told the woman that answered the phone that Quintero wasn't dumb; that Quintero would backtrack himself; and that he would probably stay along the lake; he could be going to Jessieville, Arkansas; he's got cousins, uncles and aunts there. He's been over to our house.
>
> I know that he will be looking for me, but he hasn't contacted me. I worked at Mr. Garrett's house building a roof on his trailer. I am a carpenter and heavy equipment operator. I worked on his roof until Saturday. I guess I started around six a.m., and quit seven-thirty or eight p.m. It took us four and a half days. At night I would be over at Jack Bowers' house.
>
> I've known the Vesters' since I was six or seven years old. I'm not taking up for no killer. I talked to Mrs. Vester at ten-thirty a.m., Monday morning. She called the house. She said they were going to town that morning.

In a jury-out hearing, the trial court ruled that the portion of Pallay's statement, "I'm not taking up for no killer," would not be redacted. In so ruling, the trial court said:

> The part up there that, 'I'm not taking up for no killer, I think we have got to look at the whole circumstance. At the time this statement is made, two people, neighbors of Mr. Zach Pelay [sic], had been killed. The evidence in that case, at least whether it is true or not, everybody was looking for Blanton, Hall and Quintero. TBI was going to Mr. Pelay [sic] questioning him. He told about -- the other day in here about his fear he had of the defendant, one or more of the defendants.

38

Gentlemen, all this goes to the state of mind. It don't identify anybody. Another neighbor down there could have said the same thing, whether they done it or not. It's not offered for the truth of the matter. It's not saying they are killers. I'm not going to redact the last statement --

After reviewing the issue further, the trial court stated:

There is nothing in this statement about Mr. Quintero by Mr. Pelay [sic] that hadn't already been testified to and the record will reflect that. There is no prejudice in this statement. I am going to go ahead and let Mr. Bagwell introduce the statement out of a -- between he and the State are going to stipulate that if Mr. Stout [sic] was called his statement would be -- he would testify that this is what Mr. Pelay [sic] told him.

I have again reviewed the statement, and reviewed it carefully, and reviewed the testimony of Mr. Pelay [sic], there is nothing. He's talking about Jessieville, Arkansas. He mentioned that from the witness stand. Talked about him calling the Sheriff's Department, he mentioned that from the witness stand. Talked about working on the house, Mr. Bagwell said that is the reason he wants it in because he thinks he can get him where there's some inconsistency there.

Anything that has to do with Mr. Quintero is not -- he says he's known him for eight years, he testified that from the witness stand. He did deny that he has had contact with him. Here he says he's corresponded with him. I don't think that's such a prejudicial nature. I can instruct the jury otherwise. I'm going to admit the statement Mr. Bagwell and Mr. Alsobrooks submitted and I will so instruct the jury.

Before the statement was read to the jury, the trial court gave the following jury instruction:

Ladies and Gentlemen, a stipulation has been entered into between Mr. Hall's attorneys, Mr. Bagwell and Ms. Roberts, and the District Attorney, that if Mike Breedlove was called, an agent -- special agent with Tennessee Bureau of Investigation, was called he would testify as to parts of a statement that's now going to be stated to you. This stipulation is not entered into by Mr. Quintero.

You cannot consider this statement in any way against Mr. Quintero, for or against him, you can't even consider it. Mr. Quintero -- if there's anything in there for him, you can't consider it. If there is anything in there against him, you can't consider it. It don't exist as far as Mr. Quintero is concerned. All right.

Under Tenn. R. Evid. 613(b), "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

Recently, in State v. Henry Lee Martin, No. 01C01-9411-CR-00397 (Tenn. Crim. App., at Nashville, May 24, 1996), perm. to app. granted (Tenn. Nov. 4, 1996), this Court held that the proponent of the inconsistent statement was not obligated under Rule

39

613(b) to ensure that the Rule's criteria was met before introducing the statement. Slip Op. at 20. In Martin, during rebuttal, the state introduced a prior inconsistent statement of an alibi witness. This Court held that there was no evidentiary bar to the state's introducing the extrinsic evidence of the prior inconsistent statement for impeachment purposes even though it was introduced after the witness testified. Id. Furthermore, the Court held that the appellant waived the opportunity to have the witness respond because the record did not reflect that she was then unavailable as a witness. Id.

Here, the record does not indicate that Mr. Pallay was unavailable as a witness to respond to his earlier statement to Special Agent Breedlove. According to Martin, it was not procedural error to allow appellant Hall to introduce Mr Pallay's prior inconsistent statement in order to impeach his credibility.

However, the portion of Mr. Pallay's statement to Special Agent Breedlove wherein Pallay said, "I'm not taking up for no killer," was not inconsistent with Mr. Pallay's testimony at trial. While a direct contradiction is not necessary for a statement to be inconsistent, and it is sufficient if the inconsistency has a reasonable tendency to discredit the witness' testimony, Neil P. Cohen et al., Tennessee Law of Evidence § 613.2, at 407 (3d ed.1995), here, the statement cannot be said to have had a reasonable tendency to discredit Mr. Pallay's testimony. While Pallay's statement that he was not taking up for a killer may have explained Pallay's state of mind at the time he made the statement, it does not explain why Mr. Pallay gave inconsistent statements and accordingly was irrelevant in attempting to impeach Mr. Pallay's credibility.

Although it was error for the trial court to fail to redact that portion of Pallay's statement wherein he said, "I'm not taking up for no killer," under the circumstances of this case, we find that this evidentiary error was harmless. Given the relative strength of the State's evidence of the guilt of appellant Quintero, we do not find that the objected-to portion of Mr. Pallay's statement effected the judgment or resulted in prejudice to the judicial process. See Tenn. R. App. P. 36(b) and Tenn. R. Crim. P. 52(a). As our Supreme Court said in State v. Carter, 714 S.W.2d 241, at 248 (Tenn. 1986):

> The line between harmless error and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard to convict beyond a reasonable doubt.

40

See also <u>State v. Suttles</u>, 767 S.W.2d 403 (Tenn. 1989).

Given the fact that the trial judge advised the jury that no portion of the Pallay statement could be considered against appellant Quintero, and given the fact that the proof of guilt, although circumstantial, was overwhelming, we conclude that the error was harmless beyond a reasonable doubt.

## ADMISSION OF COLOR VIDEOTAPES AND PHOTOGRAPHS AT GUILT-INNOCENCE PHASE

The appellants argue that they were denied a fair trial by the introduction of the color videos and photographs of the crime scene and of the victims' bodies. In particular, the appellants complain that the display of bodies and blood splatterings to the jury was especially prejudicial in this case of circumstantial evidence. Further, the appellants submit that the video tapes and photographs were needlessly cumulative when compared to the physical evidence and the testimony of the crime scene investigators.

At trial, a color video of the crime scene taken by the Sheriff's Department was initially shown to the jury. On the video tape, the victims' bodies could be seen as they were found at the crime scene. Also, in conjunction with the testimony of various law enforcement officials investigating this case, numerous photographs of the exterior and interior of the Vesters' house, as well as physical evidence and drawings of the house, were introduced into evidence. A second video of the crime scene was also presented to the jury, but only that portion of the video showing the exterior of the Vesters' house.

### A. Color Video Tapes

The first color video tape, which was taken when officers from the Stewart County Sheriff's Department first arrived on the scene, shows the exterior and the interior of the Vesters' home, including the victims' bodies as they were found.

The admissibility of video tapes of a crime scene is within the sound discretion of the trial court, and its ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion. <u>State v. Bigbee</u>, 885 S.W.2d 797, 807 (Tenn. 1994); <u>State v. Van Tran</u>, 864 S.W.2d 465, 477 (Tenn. 1993), <u>cert</u>. <u>denied</u>, ___ S.Ct. ___, 114 S.Ct. 1577, 128 L. Ed. 2d 220 (1994).

41

In finding that this video tape was probative, the trial court stated:

> I've reviewed this film. The bottom line, it's a picture of a crime scene. It's a good picture. I think it's much better than a still photo because a still photo you have all kinds of interpretation about angles and everything else. This is not. So this is very probative.
>
> Now, every crime scene, especially if it involves the loss of a life of someone, certainly is going to have some gruesome effect to it. If anybody cares anything about human life, it's going to have a gruesome effect to it.
>
> But in this case, the officer has done, I think, an excellent job in avoiding making the picture gruesome. It shows them, two bodies. Didn't dwell on them. It does show some blood on Mrs. Vester's leg. However, it also shows holes in the screen, one screen missing. It shows a hole in another screen. It shows the angle these had to have come from, the shots. Assuming that they prove the shots is what made the holes in the screens.
>
> I don't think it's gruesome. No more gruesome than any death of a human being. So I'm going to overrule your objection and allow the film to be admitted.

As in Bigbee, "the challenged portion of the tape is unpleasant because it shows postmortem lividity and some rigor mortis," but the trial court did not abuse its discretion in allowing the video tape to be played for the jury. 885 S.W.2d at 807. It should also be noted that no photographs of the victims' bodies were introduced at the guilt/innocence phase.

Later in the trial, a second video tape, which was taken by the T.B.I., was shown to the jury. However, the video only showed the exterior of the house and the area surrounding the house. While somewhat cumulative of the first video, it was short and provided a more concise view of the window screens and evidence found around the outside of the house. Moreover, the appellants made no contemporaneous objection to the introduction of this portion of the video. See Tenn. R. App. P. 36(a).

## B. Photographs

As with the admissibility of the video tapes, "the admissibility of photographs is a matter to be determined by the trial court in the exercise of its sound discretion." Cagle v. State, 507 S.W.2d 121, 132 (Tenn. Crim. App. 1973). Absent a clear showing of abuse of discretion, the trial court's ruling will not be overturned. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).

42

Under Tenn. R. Evid. 401, relevant evidence is defined as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

While the appellants do not specify or discuss the individual photographs they are challenging, they cite to the record where various photographs were introduced into evidence. Most of the photographs were of the exterior of the house, the different bedroom windows, the window screens, and the damaged wires in the telephone box outside the house. Only a few of the photographs, specifically four, involved blood splatterings, and none of the photographs were of the victims' bodies.[9]

The first photograph shows blood on Mr. Vester's bed and pillow. After a lengthy discussion from both sides, the trial court admitted the photograph to show premeditation and to show the angle of the shot. The second photograph shows the spray of blood in the bathroom. The trial court stated "I don't think this picture is gruesome and it does have probative value so I'll overrule the objection on that."

The third photograph shows Mrs. Vester's bed with a small amount of blood. The trial court stated "I don't think that picture is overly gruesome. And it's been revealed here to the Court, it's been stated here to the Court that they're going to show that Mrs. Vester was mortally wounded several times by different instruments and I think that kind of -- unless it gets completely out of bounds, it makes it all probative. Unless, as I say, it gets completely out of bounds, I'm going to keep -- this right here is not that gruesome and I'm going to overrule the objection and enter # 120."

The fourth photograph shows the closet next to the bathroom where there is a substantial amount of blood. In admitting the photograph, the trial court stated "[t]he fact that it shows location, it shows where [Mrs. Vester] was in the house. We've got pictures

_____

[9]One of the victim's bodies can also be seen in the background of a photograph of the Vesters' living room, which was taken to show the heating/air conditioning unit leaning against the television. However, It could not be considered gruesome in any way.

43

here now that show she was wounded in different places in the house. It's probative and it's not that gruesome either. This picture is not gruesome." The trial court went on to state that "there were some real gruesome pictures that have been excluded previously. Not in this trial but in the other trial. That I excluded. These I didn't think it was gruesome then and I don't think it's gruesome now. I think it does have probative value. So the probative value outweighs its prejudicial effect. Or prejudicial effect does not outweigh its probative value."

We find that none of the photographs were inflammatory, especially considering the facts of this case. Even though the jury convicted the appellants of felony-murder, the appellants were charged with both felony-murder and premeditated murder. Thus, the photographs were relevant in the state's attempt to prove that the murders were committed during the perpetration of a felony or were done with premeditation and deliberation; i.e., the circumstances and manner of death and the location and proximity of the shootings. In addition, the facts of this seven-week trial were complex, and the photographs and the videos were necessary to inform the jury and to help it keep each aspect of the case in order. The trial court did not abuse its discretion in allowing the state to introduce these photographs at the guilt phase. See State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477.

### PHOTO LINE-UP[10]

Appellant Quintero argues that the photo array shown to the witnesses in Memphis created a substantial likelihood of misidentification due to the suggestiveness of the array. Specifically, appellant Quintero argues that based upon the facts of this case, the photographic array was impermissibly suggestive because he was the only dark complected individual in the array, and this fact was emphasized because the background of his photograph was noticeably darker. This, appellant Quintero argues, would tend to draw the eye of anyone looking for a "dark skinned" individual. He further argues that the photo array was so suggestive that the admission of Shirley Morrow's in-court identification

---

[10]Appellant Hall merely copied appellant Quintero's argument on this issue and does not challenge the photo array as to himself. Accordingly this issue has been waived. See Tenn. R. App. P. 27; Tenn. Ct. Crim. App. R. 10(b). Regardless, a review of the record does not reveal that the photographic line-up was impermissibly suggestive as to appellant Hall.

44

denied him the right to due process of law. We agree that the photographic line-up was suggestive as to appellant Quintero. We also agree that Ms. Christof should not have been allowed to testify concerning her identification of appellant Quintero from the photo line-up; however, after reviewing the record we do not find that Ms. Morrow's identification was unduly tainted by the suggestive photo-line up.

Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from "suggestive identification procedures." Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L. Ed. 2d 401 (1972). Thus, a photographic identification is admissible unless, based upon the totality of the circumstances, "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301-302, 87 S.Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1206 (1967). In Biggers, the Court set forth a five-factor analysis for determining whether an identification tainted by suggestion may nonetheless be admitted into evidence:

1.      the opportunity of the witness to view the criminal at the time of the crime.

2.      the witness's degree of attention at the time of the crime.

3.      the accuracy of the witness's prior description of the criminal.

4.      the level of certainty demonstrated by the witness at the confrontation.

5.      the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199, 93 S.Ct. at 382; State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994).

The photographic array shown to identification witnesses Darlene Christof, Shirley Denise Morrow, and Curtis Jones included pictures of the eight escapees from Eddyville, Kentucky. Co-defendant Blanton was the first picture in the first row of four photographs, appellant Quintero's photograph was number five directly underneath co-defendant Blanton's photograph, and appellant Hall's photograph was number six, next to appellant Quintero's photograph. Appellant Quintero is the only Hispanic in the line-up and his picture is a shade darker than the others. There was no attempt to choose photographs of men with similar physical characteristics.

45

A jury-out hearing was held on the admissibility of testimony from Darlene Christof, Shirley Morrow, and Curtis Jones. At the conclusion of the hearing, the trial court held that the testimony was admissible with the exception that Mr. Jones was instructed not to testify that he had identified appellant Quintero from the photo line-up.

At the hearing, Ms. Christof testified that she was working as a dancer at Blue Movies West on June 21, 1988. Three scruffy-looking men came into her booth. Because only one person was permitted in the booth at a time, two of the men left. The third man stayed a few minutes, then left. The third man returned to the booth in a few minutes with silver dollars. He wanted Ms. Christof to dance, but he did not have enough money, so he again left.

Ms. Christof had read about the escapees in the newspaper and wanted the three men to leave. She walked to the front of the store like she was going to make a phone call and asked the people working if they had heard about the escapees from the Kentucky prison. The three men immediately left. Ms. Christof testified that the three men were only ten feet away when she made this statement.

Ms. Christof testified that she could not remember how many of the pictures she had picked out for Agent Richard Stout, who showed her the photo line-up, however, she remembered picking out number five (Quintero) because he was the only Mexican individual in the line-up. She could not pick out the three pictures at the time of her testimony, nor could she identify the men as being in the courtroom. The following colloquy occurred during cross-examination:

Q. Do you remember if you picked out anybody?

A. I think -- I'm pretty sure I picked out a Mexican looking guy.

Q. And the reason that you picked him out, would I be safe in assuming or asking you this question, the reason you picked him out was because he was Mexican looking?

A. Yes.

Q. And was that the only Mexican looking photograph that was shown to you, that there was only one Mexican looking person in the array, wasn't there?

A. Yes.

At the end of the hearing, the trial court determined that the photographic array was not suggestive and that Ms. Christof could testify.

Subsequently, Ms. Christof testified at trial that she had identified number five (Quintero) for Agent Stout as one of the three men that came into her booth. She was unable to identify appellant Quintero in the courtroom, stating that she did not see any Hispanics.

Ms. Morrow testified at the hearing that in June of 1988, she worked as cashier at the Blue Movies West near the bus station. On the morning of Tuesday, June 21, three men came into the bookstore and traded silver dollars and half dollars in order to purchase tokens to watch the "live girl" shows. Ms. Morrow also purchased some silver dollars for herself.

Fifteen or twenty minutes later, the three men returned to the cash register. Ms. Morrow carried on a conversation with appellant Quintero. He tried to sell her a class ring for $50. She told him to take it to a pawn shop, but he said he didn't have any identification. The three men were standing right around the cash register, and she was able to get a good look at them. Ms. Morrow testified that at about this time, "[Ms. Christof] came out of the back and she said, did you all hear about those prisoners that broke out up in Tennessee. And she said, you all look just like them. And then they left."

Two days later, Agent Stout interviewed Ms. Morrow and showed her the same photographic array. Ms. Morrow picked out appellant Quintero, appellant Hall, and co-defendant Blanton. She testified that appellant Quintero was heavier and shorter than the other two men. She also testified that appellant Quintero had a beard. She thought the other two were clean shaven.

At trial, Ms. Morrow testified that she picked out photograph numbers one (Blanton), five (Quintero), and six (Hall) from the line-up. She was the only witness who was able to identify both appellants in the courtroom. She pointed out that appellant Quintero did not have glasses when he came in the store and that he looked like he had lost weight. Oddly enough, Ms. Morrow identified number one (Blanton) as being of mixed descent.

47

Finally, Curtis Jones testified at the hearing that he had been a security guard at the Memphis Greyhound bus station in 1988. As part of his job, he observed people that came into the bus station to ensure that they either had a bus ticket or were waiting for someone to arrive. On June 21, Mr. Jones saw three white men come into the bus station. All of the men had long hair, one was dark skinned and looked Spanish, and the other two men were white and had mustaches. Mr. Jones testified that two of the men sat down and began watching television while the Hispanic-looking man used the telephone. One of the men watching television, whom he identified as appellant Hall, was talking to a black man waiting on someone to arrive. When the men did not buy tickets, Mr. Jones approached the two seated men and asked if they had tickets. The man, whom Mr. Jones identified as co-defendant Blanton, told him that they would leave as soon as their friend finished using the phone, which they did. Mr. Jones testified that the three men were in the bus station approximately five to ten minutes.

That same day, officers from the Memphis police department came to the bus station and showed Mr. Jones the photo-line up. He selected the photographs of co-defendant Blanton, appellant Quintero, and appellant Hall. Mr. Jones testified that the police never indicated to him which ones were the suspects or what they had done. Two days later, T.B.I. Agent Stout interviewed Mr. Jones and showed him the same photographic array. Again, Mr. Jones selected the same three photographs. Mr. Jones was able to identify appellant Hall in the courtroom but was unable to identify appellant Quintero. During cross-examination, the following colloquy occurred:

Q. Now on the photo lineup, and let me hand this back to you, just one more question or two, on that particular lineup, how many people of Spanish descent do you see on there?

A. One looks like Spanish to me.

Q. And which one is that?

A. That's number five.

Q. And for number five then, you couldn't positively identify him other than the fact that he is Spanish?

A. That's the only way I could identify him with his -- the size and the way he looked, the neck, that's the only way, but just looking him straight in the face, I didn't get a chance to see him.

48

Q. Well, then you're assuming because that was a Spanish one, that he must be the one you saw?

A. I'm pretty sure that's him.

Q. And you haven't seen him since?

A. No, I haven't.

Based on the testimony and the argument of counsel, the trial court allowed all three witnesses to testify, however, Mr. Jones was instructed not to testify about identifying appellant Quintero from the line-up since he was not actually able to see appellant Quintero's face at the bus station. At trial, when asked which photographs he was able to pick out, Mr. Jones inadvertently testified that he had picked out number one, number five, and number six. The trial court immediately instructed the jury to disregard Mr. Jones' statement concerning number five (Quintero) because the court had previously ruled that Mr. Jones could not identify number five (Quintero) from the line-up.

Our Court has held on several occasions that a pre-trial identification was admissible notwithstanding the fact that the photograph of the accused contained peculiar characteristics not contained in the remaining photographs. See, e.g., Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978) (accused was only person depicted with "short hairs growing from his chin"); Cross v. State, 540 S.W.2d 289, 290 (Tenn. Crim. App. 1976) (accused only person depicted with having an unusual hairstyle); Shye v. State, 506 S.W.2d 169, 173 (Tenn. Crim. App. 1973)(accused had lighter skin and was heavier than others depicted in the remaining photographs displayed).

Initially, we note that under the test set forth in Neil v. Biggers, the array was not impermissibly suggestive as to taint Mr. Jones' and Ms. Morrow's identifications of appellant Hall. Mr. Jones was able to view appellant Hall for five to ten minutes. Moreover, it was his job to monitor who came and went at the bus station. Because appellant Hall and co-defendant Blanton did not have tickets, Mr. Jones talked with the two men about their business there, giving him an even better opportunity to view appellant Hall. Mr. Jones gave an accurate description of appellant Hall, and he was shown the photo line-up the same day as the men had been to the bus station. Accordingly, Mr. Jones' identification testimony was properly admitted under the criteria set forth in Biggers.

49

The same is true as to the testimony of Ms. Morrow, who conversed with the three men while they stood right around the cash register. Ms. Morrow testified that she thought appellant was the one that did most of the talking, and she was able to get a good look at the men. When Ms. Morrow was shown the photo line-up within the next few days, she had no trouble in identifying appellant Hall. Moreover, when identifying appellant Hall in the courtroom, Ms. Morrow noted that his face looked the same. Accordingly, we find that any suggestiveness in the photo line-up did not taint the witnesses' identification of appellant Hall.

The same is not true concerning the identification of appellant Quintero. Both Mr. Jones, although he was not allowed to testify that he identified appellant Quintero, and Ms. Christof testified that one of the men was Hispanic and that they picked number five (Quintero) because he was the only Hispanic in the line-up. While Ms. Christof was able to view appellant Quintero for a few minutes, her only description of him was that he looked Mexican because of his darker skin. Moreover, Ms. Christof testified that she recognized the three men from the newspaper she had read earlier that morning. Further, from a review of the testimony, Ms. Christof's certainty as to her identification of appellant Quintero at the time of the confrontation appeared to be based on his Hispanic descent. At the jury-out hearing, Ms. Christof was unable to identify appellant Quintero in the courtroom, in fact, she did not see any Hispanics in the courtroom. Under Biggers, we find that Ms. Christof's identification of appellant Quintero in the photo line-up was unduly tainted by the suggestiveness of the photo line-up. However, given the identification of Quintero by Mrs. Morrow and the other evidence of guilt, the error of allowing Ms. Christof's identification testimony was harmless beyond a reasonable doubt.

Finally, we review Ms. Morrow's testimony concerning her identification of appellant Quintero. Ms. Morrow had a good opportunity to view appellant Quintero. As discussed earlier, she testified that the three men were standing around her at the cash register. Ms. Morrow testified that appellant Quintero sold her six silver dollars and that he tried to sell her a class ring. She also testified that he tried to convince her to let them stay until 11 p.m. when their ride would be there. In court, Ms. Morrow identified appellant Quintero, noting that he looked like he had lost weight and that he had not been wearing

50

glasses when she saw him at the adult bookstore. Agent Stout testified that Ms. Morrow gave a description of the men when he interviewed her the next day. Agent Stout then showed her the photo line-up, and she immediately picked out the three men. Under Biggers, we find that Ms. Morrow's identification from the photo line-up and her in-court identification of appellant Quintero were not unduly tainted by the otherwise suggestive photo line-up.

## CLOSING ARGUMENTS AT GUILT/INNOCENCE PHASE

The appellants contend that the prosecution made several improper remarks during closing arguments at the guilt/innocence phase of the trial. The standard of review in determining whether counsel was allowed too much latitude during closing argument is abuse of discretion. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. Id. The prosecutor may state an ultimate conclusion which would necessarily follow if the testimony of the prosecution witnesses was believed by the jury. State v. Brown, 836 S.W.2d 530, 552 (Tenn. 1992). Moreover, both parties must be given the opportunity to argue not only the facts in the record but any reasonable inferences therefrom. State v. Cone, 665 S.W.2d 87, 94 (Tenn.), cert. denied, 467 U.S. 1210, 104 S.Ct. 2400, 81 L. Ed. 2d 357 (1984). Having reviewed the entire record, we find that any improper comments during closing arguments by the prosecution were either harmless error or cured by the trial court's curative instructions to the jury.

The appellants first argue that the prosecutors' comments about the "slaughtered" victims, although objected to and sustained at trial, were intemperate commentaries about the nature of the crime which induced prejudice.

During closing argument, General Atkins made the following comments:

And during that process, they slaughtered these two people.

[Objection sustained]

* * * *

51

> You think, well they could have tied them up, but they shot Mr. Vester through the window before he ever had a chance to get out of bed, slaughtered him there in his bed.

> [Objection sustained, and jury instructed to disregard]

Although counsel for appellant Quintero did not refer to the "slaughtered" language during his closing argument, counsel for appellant Hall repeatedly commented on the offensiveness of the prosecutor's terminology. Subsequently, during General Alsobrooks' closing argument, he made the following comments:

> Ladies and gentlemen, he objected to my co-counsel when he referred to the deaths there as slaughter and comes right back and --

> [Objection sustained. Jury instructed to disregard because the issue has already been ruled on]

> * * * *

> Again, there have been certain objections made to the language to describe those incidents. You can put your own adjectives to what happened that night.

> [No objection.]

The trial court gave a curative instruction the first time the prosecution referred to the "slaughter" of the victims. The appellants did not request a mistrial be declared based on the prosecutors' comments and thus, waived any further action by the trial court. See Tenn. R. App. P. 36(a). Moreover, appellant Hall waived any objection by repeatedly referring to the prosecutor's comments during his own closing argument. Regardless, considering the nature of this case, the prosecution's minimal comments during closing arguments were not reversible error. The trial court sustained the objections and gave curative instructions. It is presumed that the jury followed these instructions and disregarded the prosection's improper argument. Frazier v. State, 566 S.W.2d 545, 551.[11]

The appellants next contend that General Atkins' closing argument went beyond the scope of opening argument and of the appellants' intervening argument in violation of Tenn. R. Crim. P. 29.1(b). Specifically, the appellants point to the continuous characterization of the defenses' theories and perceived theories as "smoke screens" and to the description of the appellants as "these escapees, these desperate men." While the trial court overruled the appellants' objections to the state's characterizations of their

---

[11]Our holding should in no way be interpreted by the state as condoning its disregard for the rulings of the trial court.

52

defense theories, the appellants concede that they did not contemporaneously object to the "desperate escapees" references. Instead, the appellants argue that these statements were made under the objections to improper argument and therefore, should not be considered waived.

As stated earlier, the standard of review in determining whether counsel was allowed too much latitude during closing argument is abuse of discretion. State v. Sutton, 562 S.W.2d 820, 823. Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. Id. In addition, Tenn. R. Crim. P. 29.1(b) provides in part that "the State's closing argument shall be limited to the subject matter covered in the State's opening argument and the defendant's intervening argument."

Based in great measure upon the role of the prosecutor in the criminal justice system, the most restrictions are placed on the state. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Accordingly, "the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." Id. Moreover, comments should not reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. See Dupree v. State, 219 Tenn. (23 McCanless) 492, 496-97, 410 S.W.2d 890, 892 (1967); McCracken v. State, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972).

During his closing argument, General Atkins made several comments about the strength and believability of the defense theories in this case. Throughout the argument, General Atkins used phrases such as "that's not a reasonable alternative," "such a ridiculous position," "smoke screens," and "phantom dog." Through their own witnesses and through cross-examination, the appellants offered various explanations, implied and expressed, as to the state's proof. The state was entitled to argue in response that the proof did not support these alternative theories. It cannot be said that the trial court abused its discretion in overruling the appellants' objections.

The appellants also assert that the prosecutor improperly referred to them as "desperate escapees." At the beginning of his argument, General Atkins stated that "[t]hroughout the history of the world in this country and everywhere else, some of the most

53

desperate people are escaped convicts. That's what we're dealing with, that's what we had on our hands, that was what was in the Leatherwood community."

Epithets characterizing a defendant himself are generally improper, especially where they are made to prejudice the jury against the defendant. See e.g., State v. Robinson, 622 S.W.2d 62, 71 (Tenn. Crim. App. 1980), cert. denied, LeMay v. Tennessee, 454 U.S. 1096, 102 S.Ct. 667, 70 L. Ed. 2d 636 (1981)(references to defendants as pill-headed pimps and prostitutes); State v. Tyson, 603 S.W.2d 748, 754 (Tenn. Crim. App. 1980) (comparing defendant to rats in the barn). Here, however, there was proof in the record that the appellants had escaped from prison, and this status was used to show motivation for the crimes committed. Given the facts of this case, the characterization of the appellants as "desperate escapees" was not improper.

## REASONABLE DOUBT JURY INSTRUCTION[12]

The appellants contend that the jury instruction on reasonable doubt did not lend content to the moral certainty phraseology used by the trial court. Thus, the appellants argue that there was a reasonable likelihood that the jury understood it to allow conviction based on insufficient proof in violation of the standard set forth in <u>Cage v. Louisiana</u>, 498 U.S. 39, 41, 111 S.Ct. 328, 329-30, 112 L. Ed. 2d 339 (1990) and <u>Victor v. Nebraska</u>, 511 U.S. 1, __, 114 S.Ct. 1239, 1247-48, 127 L. Ed. 2d 583 (1994).

In this case, following the language of T.P.I. --Crim. § 2.03, the trial court gave this instruction to the jury:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean the capricious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by law to convict of any criminal charge but morale [sic] certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

> The State must prove beyond a reasonable doubt all the elements of the crimes charged; that the crimes if in fact committed were committed by the defendants in Stewart County, Tennessee; and they were committed before the finding and returning of the presentments of this case.

Later in the charge, the trial court instructed the jury:

> Before a verdict of guilty is justified, the circumstances taken together must be of a conclusive nature and tendency leading the whole to a satisfactory conclusion and produce in effect a morale [sic] certainty that the defendants and no one else committed the offense.

In <u>Victor v. Nebraska</u>, the United States Supreme Court ruled that the phrase "moral certainty" may have lost its historical meaning and that modern juries, unaware of the historical meaning, might understand "moral certainty," in the abstract, to mean something less than the high level of determination constitutionally required in criminal cases. While the Court expressed criticism of the continued use of the "moral certainty" phrase, the Court did not actually hold that it was constitutionally invalid. Instead, the Court looked to the full jury charge to determine if the phrase was placed in such a context that a jury would understand that it meant certainty with respect to human affairs. <u>Id</u>. at ___,

---

[12]This issue was waived by the appellants' failure to raise it at trial or in their motions for new trial. <u>See</u> <u>State v. Baker</u>, 785 S.W.2d 132, 135 (Tenn. Crim. App. 1989). However, because of the qualitative difference between death and other sentences and because of the seriousness of the issue, we have chosen to address the merits of the issue. <u>See</u> <u>State v. Bigbee</u>, 885 S.W.2d 797, 805 (Tenn. 1994); <u>State v. Strouth</u>, 620 S.W.2d 467, 471 (Tenn. 1981), <u>cert</u>. <u>denied</u>, 455 U.S. 983, 102 S.Ct. 1491, 71 L. Ed. 2d 692 (1982).

114 S.Ct. at 1247-48. In particular, the Supreme Court was concerned with the terms "grave uncertainty" and "actual substantial doubt." Cage v. Louisiana, 498 U.S. 39, 41, 111 S.Ct. 328, 329-30, 112 L. Ed. 2d 339.

In this case, the terms of particular concern to the United States Supreme Court were not included in the jury charge. In several cases, this Court has upheld similar instructions as consistent with constitutional principles. See Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim. App. 1994); State v. Hallock, 875 S.W.2d 285, 294. Moreover, our Supreme Court has held that "the use of the phrase 'moral certainty' by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt." State v. Nichols, 877 S.W.2d 722.

Thus, the full charge given by the trial court, although containing the phrase "moral certainty," did not violate the appellants' rights under the United States or Tennessee Constitutions.

## ARREST AND EXTRADITION FROM MEXICO

Appellant Quintero argues that imposition of the death penalty violates his due process rights under the United States and Tennessee Constitutions because he was unlawfully seized without a warrant or other process in Juarez, Mexico, and transported to El Paso, Texas, by Mexican officials acting in concert with F.B.I. agents in Texas. Consequently, appellant Quintero asserts that his death sentence is the fruit of an illegal action by agents of the United States government. Although his habeas corpus petitions filed in Texas and in Kentucky were denied, he claims that the findings of these courts support his claim that his seizure in Mexico and transport to the United States violated his rights to judicial process and the appointment of counsel under the Mexican Constitution and under Mexico's obligation under the American Convention on Human Rights. Moreover, appellant Quintero argues that the means by which his presence was acquired so that he could be sentenced to death "shocks the conscience" in violation of due process. We find this issue to be without merit.

In order to determine whether due process requires that an extradited defendant must be returned, a two-prong test must be applied: (1) was the extradition

procedure challenged in advance of trial, and (2) did an evidentiary hearing establish that the conduct of governmental authorities was so illegal and outrageous as to shock the conscience of the court. Sneed v. State, 872 S.W.2d 930, 937 (Tenn. Crim. App. 1993).

In affirming the denial of appellant Quintero's habeas corpus petition, the Texas Court of Appeals acknowledged the illegality of the action taken by Mexican and F.B.I. agents:

> The case law proffered by the State and relied upon by this Court in previously upholding these denials of habeas corpus relief stand only for the proposition that isolated, spontaneous illegal seizures of the person, absent abusive treatment shocking to the conscience, will not support a challenge to the Court's personal jurisdiction over the fugitive, Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); United States v. Toscanino, 500 F.2d 267 (2nd Cir. 1974). We do not construe these cases and others cited in Day and Quintero as affirmative, prospective sanctions for the F.B.I. or any other state or federal law enforcement agency, either directly or through surrogates, to establish a regular policy and practice of engaging in such activity of illegally seizing United States citizens in a foreign country.
>
> We uphold the denial of relief in this case because the four seizures which we have been presented, in fact, reflect but two transactions. A third occurrence will in all probability necessitate consideration of whether we are not, in fact, seeing the results of an organized, coordinated program of international kidnapping which has become a policy of at least this regional branch of the F.B.I. That agency and any other law enforcement agency acting in concert in such activity would be well-advised not to rely upon this Court's resolutions of the Day-Day and Quintero-Blanton cases. This caveat applies to any such seizure occurring after the date of this opinion. Otherwise, Appellant's four points of error are overruled.

Day v. State, 763 S.W.2d 535, 536 (Tex. App.--El Paso 1988). See Quintero v. State, 761 S.W.2d 438 (Tex. App.--El Paso 1988), cert. denied, 493 U.S. 826, 110 S.Ct. 90, 107 L. Ed. 2d 55 (1989); Blanton v. State, 753 S.W.2d 504 (Tex. App. -- Beaumont 1988).

Once extradited to Kentucky, appellant Quintero filed a petition for writ of habeas corpus in the Circuit Court of Lyons County, Kentucky, which was denied and then affirmed on appeal. The trial court's factual findings were, in part, as follows:[13]

1.      Petitioners, James Blanton, William Hall, and Derrick Quintero escaped from the Kentucky State Penitentiary on June 16, 1988.

2.      Petitioner Hall was apprehended in the United States and returned to Kentucky State Penitentiary on July 9, 1988.

---

[13]The Kentucky circuit court's findings are included in the appendix to the appellant's brief; however, the document does not appear in the record.

3. On July 10, 1988, Eric Benson and other FBI agents went to Juarez, Chihuahua, Mexico, and arrested James Blanton and Derrick Quintero in a room at the Santa Fe Hotel.

4. There were no arrest warrants issued in Mexico authorizing the arrest of Petitioners Blanton and Quintero.

5. There was no formal extradition request made by authorities of the United States to apprehend and arrest the Petitioners and have the Petitioners extradited from Mexico to the Untied States for trial.

6. Petitioners Blanton and Quintero were brought from Juarez, Mexico, to El Paso, Texas, by FBI agents acting in joint concert with Mexican Federal Judicial Police, without benefit of having any judicial process in Mexico used to aid in their apprehension.

7. Petitioners Blanton and Quintero were not brought before any Judge in Mexico for purposes of having any hearing regarding their arrest.

8. Petitioners Blanton and Quintero were neither formally deported from Mexico nor afforded any deportation hearing in Mexico.

9. On January, 25, 1980, Mexico and the United States entered into a Treaty regarding extradition.

10. Officials of the United States did not go through diplomatic channels to extradite Petitioners Blanton and Quintero.

11. Officials of the United States did not send the following documents to Mexico: a description of the offense; a statement of facts; text of legal provisions describing essential elements of the offense; text of legal provisions describing the punishment for the offenses; time limitations on prosecution or execution of sentence; identification information; certified copies of arrest warrants; and evidence justifying apprehension.

12. Mexico does not have a death penalty.

13. All three of the Petitioners were arrested pursuant to fugitive warrants issued by the U.S. District Court, Western District of Kentucky.

While the order of the Kentucky court is not contained in the record, it is implicit that it did not find these facts to be sufficiently "shocking" so as to grant the appellant's writ of habeas corpus.

Before trial in this case, appellant Quintero filed a Motion to Bar the State From Seeking the Death Penalty, alleging that his illegal seizure by government agents prevented the Mexican government from receiving assurances that he would not be subjected to the death penalty, and that kidnapping him from Mexico violated his state and

federal constitutional rights, including those guaranteed by Article I, § 8 of the Tennessee Constitution. This motion was summarily denied by the trial court.

In Sneed v. State, this Court stated:

> In our view, Swaw [v. State, 3 Tenn. Crim. App. 92, 457 S.W.2d 875 (1970)] stands for the proposition that after a fair trial and conviction, there is simply no remedy available irrespective of the nature of the governmental action bringing the defendant into this jurisdiction. The Ker-Frisbie doctrine would prevail. The failure to assert any due process violation before trial would serve as a waiver of personal jurisdiction. If, however, the procedure is challenged in advance of trial and an evidentiary hearing establishes that the conduct of governmental authorities, as opposed to that of any private individual, is so illegal and outrageous as to shock the conscience of the court, the law of the land clause provides a measure of relief. See Tenn. Const. art. I, § 8. The accused must be returned to the asylum state pending the initiation of the extradition procedure.

872 S.W.2d at 937.

In the present case, the issue of whether appellant Quintero's extradition violated his due process rights has been reviewed by the courts in Texas and Kentucky. The courts have agreed that the actions of the F.B.I. were illegal, yet neither court found that such action shocked the conscience. Appellant Quintero argues that this Court should find that "extradition to execute" shocks the conscience. However, in this state, our Supreme Court has determined that the death penalty is not cruel and unusual punishment. See State v. Black, 815 S.W.2d 166, 179 (Tenn. 1991). Thus, the fact that appellant Quintero received a death sentence does not suggest that the Texas and Kentucky courts incorrectly held that the illegal actions of the F.B.I. were not so outrageous as to demand relief.

**ADMISSION OF PHOTOGRAPHS AT SENTENCING PHASE**

The appellants contend that the photographs of Mrs. Vester's body, which were introduced at the sentencing phase, even if relevant, should have been excluded because their value was substantially outweighed by the danger of unfair prejudice or an undue tendency to suggest to the jury that it reach a decision based on emotion. We find that the trial court properly allowed the state to introduce these photographs to show that the murder was especially heinous, atrocious, or cruel.

At a jury-out hearing, the trial court determined that the three photographs of which the appellants complain were admissible. The first photograph shows the

bathroom where Mrs. Vester's body was found just outside the door. There is a substantial amount of blood on the floor and some splatterings of blood on the bathtub and commode. The second photograph shows a full length view of Mrs. Vester as she was found at the crime scene. In admitting these two photographs, the trial court stated:

> Gentlemen, I'm going to admit Exhibit #288, and 286. 286 and 288 will show everything that you can expect to see as far as the State is concerned in Exhibit #287 and 285. In addition to that, the one, the Exhibit #288 shows more of an evidence of a struggle on the bed, the floor, the wall, the bathroom. And also 286 shows extreme struggling, so I'm going to admit those.

The third photograph shows Mrs. Vester's feet with blood on them. In admitting this photograph, the trial court held:

> Exhibit #290 shows the feet of Mrs. Vester. The Court is of the opinion that that picture does go and is admissible to show that the torture and the -- that Mrs. Vester run around in her own blood, somebody's blood. It's obvious on her feet. I think that that picture certainly has probative value and it's not that prejudicial. It's a horrible scene but this is a horrible crime, so I'm going to overrule your objection as to #290 and admit that.

The introduction of photographs of the victim's body at the sentencing phase in order to prove that a murder was heinous, atrocious, or cruel has been repeatedly upheld. See State v. McNish, 727 S.W.2d 490, 494-95 (Tenn.), cert. denied, 484 U.S. 873, 108 S.Ct. 210, 98 L. Ed. 2d 161 (1987); State v. Smith, 868 S.W.2d 561, 579 (Tenn. 1993), cert. denied, ___ U.S. ___, 115 S.Ct. 417, 130 L. Ed. 2d 333 (1994); State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 743, 130 L. Ed. 2d 644 (1995). In comparison, the photographs introduced in the present case were not shockingly gruesome. Moreover, the photographs were not shockingly gruesome in comparison to the photographs excluded by the trial court in this case. Thus, under the standard of abuse of discretion, the photographs were properly admitted into evidence to show that the murder of Mrs. Vester was heinous, atrocious, or cruel.[14]

## HEINOUS, ATROCIOUS, AND CRUEL AGGRAVATING CIRCUMSTANCE

Pointing to the language of the jury instruction given by the trial court, the appellants argue that the aggravating circumstance set forth in T.C.A. § 39-2-203(i)(5) (1982), (that the murder was especially heinous, atrocious, or cruel in that it involved

---

[14]Although one photograph of Mr. Vester's body was admitted to show that his murder was also heinous, atrocious, or cruel, the jury did not sentence the appellants to death for the murder of Mr. Vester.

60

torture or depravity of mind) is constitutionally vague.[15]  The appellants contend that this aggravating circumstance is undefined and is not cured by defining "depravity of mind" as moral corruption or a wicked or perverse act, thus, making the aggravating circumstance unconstitutional.

Our Supreme Court has repeatedly held that this aggravating circumstance is not unconstitutionally vague or overbroad.  See State v. Williams, 690 S.W.2d 517, 526-30 (Tenn. 1985).  See also State v. Black, 815 S.W.2d 166, 181; State v. Barber, 753 S.W.2d 659, 670 (Tenn.), cert. denied, 488 U.S. 900, 109 S.Ct. 248, 102 L. Ed. 2d 236 (1988).

The appellants also argue that this aggravating circumstance was not an appropriate basis for a death sentence in this case because the evidence does not support a finding that the murder of Mrs. Vester involved "torture or depravity of mind."  The appellants argue that the murder did not involve torture because there were no defensive wounds, with the possible exception of the shotgun wound to the victim's right forearm, and because there were no torture wounds.  Moreover, the appellants argue that there is no proof of depravity of mind, citing State v. Van Tran, 864 S.W.2d 465, 479-80.  The appellants also assert that there is no physical evidence placing them at the scene of the murder or showing that either of them were the ones who actually shot or stabbed the victim.  We find that the evidence overwhelmingly supports application of this aggravating factor.

Here, the proof showed that Mrs. Vester was initially shot from her bedroom window.  She was then shot two more times.  One of the wounds was from a shotgun blast and nearly severed her forearm.  As she struggled to save herself, stepping in her own blood, she was stabbed 13 times, resulting in the two fatal wounds. The medical testimony indicated that Mrs. Vester could have lived up to fifteen minutes after receiving these wounds.  The medical examiner testified that there were no torture wounds, wounds inflicted for the purpose of torturing the victim, or defensive wounds, with the potential

---

[15]The present statute, T.C.A. § 39-13-204(i)(5), effective November 1, 1989, states that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.  Because the murder of Mrs. Vester took place in 1988, the "torture or depravity of mind" standard found in T.C.A. § 39-2-203(i)(5)(1982) was properly applied.  See State v. Cazes, 875 S.W.2d 253, 267; State v. Smith, 893 S.W.2d 908, 920 (Tenn. 1994), cert. denied, ___ U.S. ___, 116 S.Ct. 99, 133 L. Ed. 2d 53 (1995).

exception of the wound to Mrs. Vester's forearm.  Because the medical examiner could not determine the position of the arm when Mrs. Vester was shot, he could not rule out the possibility that this was a defensive wound.  Moreover, the presence of blood in Mrs. Vester's bed, bedroom, and bathroom clearly indicates a struggle was involved.

As in State v. Smith, 893 S.W.2d 908, the evidence supports a finding of either torture or depravity of mind.  Id. at 920.  Moreover, this case is easily distinguished from the facts in State v. Odom, 928 S.W.2d 18 (Tenn. 1996),[16] in which the Supreme Court held that "rape (penile penetration) does not ordinarily constitute 'torture' or 'serious physical abuse' within the meaning of the statute."  Id. at 26.  The Court also found "[i]n a similar vein, and with the same disclaimer above-appearing, we must reject the conclusion that the three stab wounds evidenced in this case constituted 'torture' or serious physical abuse beyond that necessary to produce death."  Id.

Based on the facts in the present case, as set out above, the proof of torture and depravity of mind is overwhelming.  Cf. State v. Smith, 868 S.W.2d 561, 579-80; State v. McNish, 727 S.W.2d 490, 494 (victim beaten several times and remained alive and at least partially conscious throughout her ordeal); State v. Zagorski, 701 S.W.2d 808, 814 (Tenn. 1985), cert. denied, 478 U.S. 1010, 106 S.Ct. 3309, 92 L. Ed. 2d 722 (1986)(infliction of gratuitous violence and needless mutilation of victims who were already helpless from fatal wounds).  This issue is without merit.

### AVOIDANCE OF ARREST OR PROSECUTION AGGRAVATING CIRCUMSTANCE

The appellants argue that the state failed to present any proof during the guilt or sentencing phases to support a finding that the aggravating circumstance found in T.C.A. § 39-2-203(i)(6) (1982) (the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution) should apply.  The appellants cite to several cases which they argue are distinguishable.  See eg., State v. Melson, 638 S.W.2d 342, 367 (Tenn. 1982), cert. denied, 459 U.S. 1137, 103 S.Ct. 770, 74 L. Ed. 2d 983 (1983)(record shows that victim threatened to expose defendant's crime); State v.

---

[16]Odom was decided under the current statute which requires that the murder involve torture or serious physical abuse beyond that necessary to produce death in order to be found heinous, atrocious, or cruel.

Teague, 645 S.W.2d 392, 399 (Tenn. 1983)(victim was killed to prevent her from testifying against defendant on unrelated charge); State v. Adkins, 653 S.W.2d 708, 716 (Tenn. 1983)(victim was prosecutor in another charge against defendant); State v. Coe, 655 S.W.2d 903, 913 (Tenn. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L. Ed. 2d 203 (1984)(victim knew defendant and could have later identified him). While we agree that the evidence does not support application of this aggravating circumstance, we find that it was harmless error under State v. Howell, 868 S.W.2d 238, 259-62.

In State v. Smith, 868 S.W.2d 561, 580, our Supreme Court held that for purposes of applying this circumstance, the state need only prove that at least one motive for the killing was the prevention of arrest or prosecution. In Smith, there was proof that the victim made a futile 911 phone call in order to report the crime and secure the appellant's capture by law enforcement officers. The record in Smith also supported a finding that the appellant knew of the efforts to contact police, and that was evidence of the appellant's motive. Id. In contrast, the Supreme Court held in State v. Branam, 855 S.W.2d 563 (Tenn. 1993), that the evidence was insufficient to support application of this aggravating factor:

> The proof elicited by the state at trial tends to show that Tommy Joe Walker [the triggerman] 'flipped out' and shot Gladys Houston because she tried to fire her gun at him. On appeal, the state theorizes that Houston was shot because she started honking her car's horn and thereby threatened detection of her assailants. However, two next-door neighbors testified unequivocally that the shots were fired before the horn began to sound. The defendant's statement to Naomi Elliott also supports this chronology. It speaks of a robbery 'gone wrong', and not a deliberate decision on the part of any of the three men involved to kill for the purpose of avoiding apprehension.
>
> The only other possible theory supporting the existence of a subsection (i)(6) aggravating circumstance is the argument that because the defendant had previously worked at the victim's stockyard, it could be inferred that the victim might recognize him. But there is not a shred of evidence in the record to prove that this consideration motivated Tommy Joe Walker to shoot Gladys Houston.

Id. at 570.

A review of the record in the present case shows that there is no proof that the appellants' killed Mrs. Vester to prevent arrest or prosecution. Specifically, there is no proof that Mrs. Vester knew the appellants or would have been able to identify them to law enforcement officers. In fact, the proof indicates that Mrs. Vester was unaware of the

63

impending events as she was shot from outside the house. Upon entering the house, the appellants further wounded Mrs. Vester, stole the car keys, and drove off in the Vesters' vehicle. The state's theory that the appellants shot Mrs. Vester in order to prevent the theft being reported or in order to avoid having any eyewitnesses to this theft is not supported. While this is a circumstantial case, unfortunately, the state presented unsupported theories in asking the jury to apply this aggravating circumstance. Regardless, as will be discussed later in this opinion, we find that application of this aggravating factor was harmless error under State v. Howell, 868 S.W.2d 238, 259-62.

## ESCAPE FROM LAWFUL CONFINEMENT AGGRAVATING FACTOR

The appellants assert that this aggravating circumstance should be limited to those homicides which occur during the actual departure from the place of confinement itself. The appellants further aver that this aggravating circumstance was intended to protect law enforcement officers and not meant to be extended to acts which occur days later in another state. Thus, the appellants submit that use of this aggravator cannot be sustained or is otherwise constitutionally vague as applied to the facts of this case. We disagree.

Under T.C.A. § 39-2-203(i)(8)(1982), the jury could consider as an aggravating circumstance that the "murder was committed by the defendant while the defendant was in lawful custody or in a place of lawful confinement or during the defendant's escape from lawful custody or from a place of lawful confinement."

In its recent controversial opinion, State v. Odom, 928 S.W.2d 18 (Tenn. 1996), a majority of the Supreme Court found that the record contained no justification for the jury's finding of this aggravating factor. In explaining its holding, the Court stated:

> Our rationale is simple -- 'during' as used in the statute means 'throughout the continuance of.' The end of the escape marks the beginning of one's status as an 'escapee.' Although Odom was, assuredly, an 'escapee,' by no stretch can we say that the murder occurred during the defendant's escape from lawful confinement or during the defendant's escape from lawful custody or from a place of lawful confinement. When he committed the murder, Odom's escape was an accomplished fact--a fait accompli.

Id. at 27. The Supreme Court noted that in previous cases, the defendants had been in custody at the time of the murder. See eg., State v. Hartman, 896 S.W.2d 94, 104 (Tenn.

64

1995)(murder committed while defendant, a prison "trusty," was in constructive custody of sheriff's department); State v. Sutton, 761 S.W.2d 763, 767 (Tenn. 1988), cert. denied, 497 U.S. 1031, 110 S.Ct. 3287, 111 L. Ed. 2d 796 (1990)(murder committed while defendant was incarcerated).

As explained in Odom, status as an "escapee" is not sufficient to support application of this aggravator. We find that the facts of this case are readily distinguishable from the facts in Odom. In Odom, the murder took place almost six weeks after the defendant had escaped from a Mississippi jail where he was serving a life sentence for murder. Moreover, the murder for which Odom was sentenced to death could not be viewed in any way as furthering his escape. Here, the appellants escaped from the prison at Eddyville and stole a truck from the Rogers, who lived near the prison. The appellants then fled to the Leatherwood community in Stewart County, Tennessee, where they stole items, including the Vesters' car, needed to successfully complete their escape to Mexico. Unlike in Odom, at the time of the murder, the appellants were still in the process of escaping from Eddyville to Mexico. The murder of Mrs. Vester was simply a step toward accomplishing this end.

From our review of the record, we find that the proof supported the jury's application of this aggravating factor.

### FELONY-MURDER AGGRAVATING CIRCUMSTANCE

The appellants contend that it was error to allow the state to use felony-murder as an aggravating circumstance at the sentencing hearing after they had been convicted of murder in the perpetration of first-degree burglary. See State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992). We agree, however, under State v. Howell, 868 S.W.2d 238, 259-62, we find that this error was harmless.

The felony-murder aggravating circumstance is set forth in T.C.A. § 39-2-203(i)(7)(1982):

> The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb;

In Middlebrooks, the Tennessee Supreme Court held that the state is precluded from using felony-murder as an aggravating circumstance when the underlying conviction is felony-murder. Id. at 346. However, in State v. Hines, 919 S.W.2d 573 (Tenn. 1995), cert. denied, ___ U.S. ___, 65 U.S.L.W. 3259 (1996), the Supreme Court held:

> Where, as in the instant case, a felony not underlying the felony murder conviction is used to support the felony murder aggravating circumstance, there is no duplication. Furthermore, under these facts the aggravating circumstance as applied restricts the sentencer's discretion to those who kill while in the perpetration of multiple felonies, a class of murderers demonstrably smaller and more blameworthy than the general class of murderers eligible for the death penalty . . . Under these circumstances, where a felony other than that used to prove the substantive offense is used to establish the aggravating circumstance, there is no constitutional prohibition against the use of the aggravating circumstance in § 39-2-203(i)(7) to support the imposition of the death penalty for felony murder.

Id. at 583. The Court also stated that "the felony underlying the conviction in this case is clear, as is the use of the two different and additional felonies to establish the aggravating circumstance found by the jury." Id.

In the present case, the appellants were convicted for the murder of Mrs. Vester during the perpetration of first-degree burglary. Also in relation to the Vesters, the appellants were convicted of first-degree burglary, grand larceny, and petit larceny. The state argues that because the jury could have relied on one of these other felonies in applying the felony-murder aggravating circumstance, there is no Middlebrooks violation. We find that the holding in Hines requires something more.

During its opening statement at the sentencing phase, the state read the felony-murder aggravating circumstance to the jury and then stated "[i]n our circumstances, we'll be talking about burglary. That's felony murder, the aggravated circumstance." Moreover, during closing argument, the state told the jury "I believe the Judge will charge you, the murder was committed while the defendant was engaged in committing or was attempting to commit or was an accomplice in the commission of several crimes. And that has been found by your verdict that these defendants committed murder while perpetrating the crime of first degree burglary." Later the state argued to the jury that "[t]here's no question and you found it in your first verdict, that these murders were committed while the defendant, these defendants and their cohort in this case were burglarizing, and robbing

66

the Vesters and taking their car. No one would question that, and there's no doubt about it by your original verdict." When the jury returned its verdict, it did not specify which felony or felonies it was relying on in applying this aggravating circumstance, thus, we are left to speculate as to the basis of the jury's decision.

Middlebrooks was released after this case was tried, but before the motions for new trial were heard. At the hearing on the motions for new trial, the trial court ruled:

> I'm going to rule that if -- that the felony murder was harmless error in this case -- I don't think the jury even considered it, I think we've got something to look at to show they didn't . . . What I'm saying is, in this case we've got here, it's different. I'm not going to grant a new trial. I've thought about this and thought about it and read the Middlebrooks case two or three times, I just feel like this case is different.

> Because of the way they found in Mr. Vester's case as opposed to Ms. Vester's case, every aggravating circumstance that could have been used in both cases except -- it's no different, they escaped, felony murder, everything used in Mr. Vester's case was used in Ms. Vester's case. And they ruled that it was not a death penalty case in Mr. Vester's case, ruled it was in hers. You could only come down to the final conclusion that the atrocious and cruel part of the charge was what they considered and I'm going rule it like that and that's it.

On the record before us, the Court cannot determine which felony or felonies the jury relied on in applying the felony-murder aggravating circumstance. The trial court did not limit its jury instruction on this aggravating circumstance to the felonies involved in this case. As with the charge, the jury's verdict included all the felonies listed in the statute. This Court cannot assume that the jury relied on a felony other than first-degree burglary, especially in light of the prosecution's argument to the jury. Thus, use of this aggravating circumstance is invalid under Middlebrooks and Hines. However, as stated earlier, we find that application of this circumstance was harmless error under State v. Howell, 868 S.W.2d 238, 259-62.

## HARMLESS ERROR ANALYSIS

The appellants argue that under State v. Howell, 868 S.W.2d 238, the invalidation of one or more aggravating circumstances requires that this matter be remanded for resentencing. Although we find two of the applied aggravating factors are invalid in this case, we have determined that their erroneous application was harmless error.

67

In State v. Howell, our Supreme Court held that:

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed.

Id. at 260-61. These factors include, without limitation, the following:

(1) The number and strength of remaining valid aggravating circumstances.

(2) The prosecutor's argument at sentencing.

(3) The evidence admitted to establish the invalid aggravator.

(4) The nature, quality, and strength of the mitigating evidence.

Id. at 261.

In Howell, the jury found two aggravating circumstances: (1) that the defendant had been previously convicted of one or more felonies involving the use or threat of violence, and (2) that the murder had been committed while the defendant was engaged in committing a felony. T.C.A. § 39-2-203(i)(2) and (7) (1982). Howell, charged with first-degree felony murder of a quick shop employee, had been previously convicted of first-degree murder, attempted murder, and two armed robberies.

In the case under review, the jury was instructed to consider five possible statutory aggravating circumstances: (1) that the appellants had been previously convicted of one or more felonies involving the use or threat of violence to the person, (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, (3) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the appellants or another, (4) that the murder was committed while the appellants were engaged in committing or were accomplices in the commission of, or were attempting to commit, or were fleeing after committing or attempting to commit, any first-degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb, and (5) that the murder was committed by the appellants while they were in lawful custody or in a place of lawful confinement or during their escape from lawful custody or from a place of lawful confinement. T.C.A. § 39-2-203(i)(2), (5), (6), (7), and (8) (1982). In returning its verdict, the jury found all five aggravating circumstances.

68

Initially, several factors support a finding of harmless error under Howell. First, no additional evidence, nor any evidence that was not already properly before the jury, was introduced in support of the invalid aggravators. At the sentencing hearing, the state only introduced proof of the prior convictions and proof that the murders were heinous, atrocious, or cruel. Second, while the prosecutors did talk about all five aggravating circumstances during opening and closing argument, their main focus was on the heinous, atrocious, or cruel aggravator. Compare Barber v. State, 889 S.W.2d 185, 189-90 (Tenn. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1177, 130 L. Ed. 2d 1129 (1995). The prosecution's other emphasis was on the appellants' escapee status, especially during the guilt phase. In contrast, the mitigating proof was minimal.

To determine whether application of the felony-murder and avoidance of arrest or prosecution aggravating circumstances was harmless error, it is necessary to review the weight of the remaining three aggravating circumstances (previous convictions of felonies involving the use or threat of violence, the murder was heinous, atrocious, or cruel, and the murder was committed during escape from lawful custody).

First, the state presented proof that appellant Quintero had been previously convicted twice in Kentucky of escape in the first degree and once of first-degree robbery. The state also presented proof that appellant Hall had been previously convicted of two separate assault in the second degree charges, wanton endangerment in the first degree, and aiding and abetting in threatening the life of the President and Vice-President of the United States. As stated in Howell, "more crucial than the sum of the remaining aggravating circumstances is the qualitative nature of each circumstance, its substance and persuasiveness, as well as the quantum of proof supporting it." 868 S.W.2d at 261. This is particularly true of this aggravating factor, and its effect and qualitative persuasiveness increases where there is proof, as in this case, of more than one prior violent felony conviction. See State v. Nichols, 877 S.W.2d 722, 738.

Furthermore, as discussed earlier, the proof that the murder of Mrs. Vester was heinous, atrocious, or cruel in that it involved torture or depravity of mind was strong. Our Supreme Court has upheld a death sentence where this was the only valid aggravating circumstance remaining. See Barber v. State, 889 S.W.2d 185, 190. Finally, proof that

the murders were committed during the appellants' escape from lawful custody to Mexico is also supported by the proof.

Accordingly, although we find that two of the five aggravating circumstances applied by the jury are invalid, it is clear that any error was harmless under Howell. Therefore, both appellants' sentences of death are affirmed.

## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTES

The appellants argue, without raising any specific challenges, that under T.C.A. §§ 39-2-203 and -205 (1982), there is no meaningful narrowing of death eligible defendants. Specifically, the appellants assert that Tennessee's death penalty statutes have resulted in the arbitrary and capricious infliction of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 8, 9, 16, and 17, and Article II, § 2 of the Tennessee Constitution.

This argument has been rejected by our Supreme Court on numerous occasions. See State v. Middlebrooks, 840 S.W.2d 317, 335; State v. Howell, 868 S.W.2d 238, 258-59. The Supreme Court has held repeatedly that the death sentence under the Tennessee statutory scheme is not imposed capriciously and arbitrarily. State v. Shepherd, 902 S.W.2d 895, 907; State v. Smith, 893 S.W.2d 908, 926. This issue is without merit.

## CLOSING ARGUMENTS AT PENALTY PHASE

The appellants contend that the prosecution made several improper remarks during closing arguments. The standard of review in determining whether counsel was allowed too much latitude during closing argument is abuse of discretion. State v. Sutton, 562 S.W.2d 820, 823. Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. Id. The prosecutor may state an ultimate conclusion which would necessarily follow if the testimony of the prosecution witnesses were believed by the jury. State v. Brown, 836 S.W.2d 530, 552. As compared to the comments made during the prosecutors' closing arguments in State v. Blanton, 01C01-9307-CC-00218 (Tenn. Crim. App. April 30,

1996), it is clear that the prosecutors' closing arguments in this case did not violate the appellants' constitutional rights. Slip Op. at 53-60.

The appellants first contend that the prosecutor improperly urged the jury to impose the death penalty because the appellants represented a future danger. At the beginning of closing arguments, the prosecution misrepresented the proof concerning the appellants' prior convictions and stated "[t]he society won't be safe from these individuals until they are removed from--." The appellants' objections were sustained, and a bench conference followed. At the end of the bench conference, the trial court instructed the prosecution not to talk about the safety of society and to stay within the proof. Immediately, the prosecution made the following remarks:

> Ladies and gentlemen, the facts in this case, under the law that Judge Wallace will give you, under the facts that you have heard requires that these defendants, both of them individually -- you consider their cases individually -- it requires that they be put on death row, where they won't pose this type of threat to the community again. That's what the law and the evidence in this case requires.
>
> * * * *
>
> And you as the jury, I believe you have the right to protect your community against these people.
>
> [Objection sustained, and jury told to disregard that statement.]

In its final closing argument, the prosecution made the following comment:

> Can you risk that kind of individual [defendant Hall] in a life sentence? And it's also presuming that he's going to stay in the penitentiary.
>
> [Objection overruled because defendant Hall opened the door by arguing that he could become a productive citizen with life sentence]

A capital sentencing jury is not precluded from consideration of the future dangerousness of a particular defendant where such is a relevant factor under a state's capital sentencing law. See Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L. Ed. 2d 929 (1976); California v. Ramos, 463 U.S. 992, 1001, 103 S.Ct. 3446, 3453, 77 L. Ed. 2d 1171 (1983); Spaziano v. Florida, 468 U.S. 447, 461-62, 104 S.Ct. 3154, 3163, 82 L. Ed. 2d 340 (1984).

Generally, however, our Courts have held that the issue of specific or general deterrence should be avoided by the prosecution in closing argument at a capital sentencing hearing. See State v. Bates, 804 S.W.2d 868, 881-82 (Tenn.), cert. denied,

71

502 U.S. 841, 112 S.Ct. 131, 116 L. Ed. 2d 98 (1991); State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988), cert. denied, 489 U.S. 1072, 109 S.Ct. 1357, 103 L. Ed. 2d 825 (1989). Specifically, the deterrence argument is usually irrelevant to the aggravating circumstances listed in Tennessee's statute. State v. Bates, 804 S.W.2d at 882. Thus, "unless relevant to some theory raised by the State[']s proof, or the defense, it interjects an element into the jury's considerations not provided for by the law." Id. In Bates, the defendant's mitigating theory was that the defendant was mentally disturbed to such a degree that it lessened his culpability, that he would be confined for the rest of his natural life, and that he would be amenable to treatment and rehabilitation. The Supreme Court held that the state's argument concerning specific deterrence was in direct response to the defendant's theory and was not improper under the circumstances. Id.

In the present case, as found by the trial court, appellant Hall opened the door to such argument by presenting proof that if sentenced to life imprisonment, he could become a productive citizen, leaving the impression to the jury that he was going to stay in prison. Although appellant Quintero waived closing argument, his proof implied that he could be rehabilitated if given a life sentence. Regardless, as pointed out in State v. Irick, 762 S.W.2d 121, in reviewing the propriety of argument in a capital sentencing proceeding, the reviewing court must determine whether the prosecutor's comments affected the sentencing decision. Id. at 131. "If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment." Id. (citing Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2646, 86 L. Ed. 2d 231 (1985)). Based on the proof presented, it is clear that these few comments did not affect the jury's sentencing decision.

The appellants next assert that the prosecutor diminished the jury's sense of responsibility in determining the sentence in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L. Ed. 2d 231.

In Caldwell, the Supreme Court stated that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29, 105 S.Ct. at 2639. In reviewing an alleged violation under

72

Caldwell, the Court must "first determine whether the prosecutor's comments to the jury were such that they would minimize the jury's role and sense of responsibility for determining the appropriateness of death as a sentence and, if so, whether the trial judge sufficiently corrected the impression left by the prosecutor." State v. Cazes, 875 S.W.2d 253, 263; State v. West, 767 S.W.2d 387, 399 (Tenn. 1989), cert. denied, 497 U.S. 1010, 110 S.Ct. 3254, 111 L. Ed. 2d 764 (1990).

The prosecution made comments during closing argument such as "it requires that they be put on death row, where they won't pose this type of threat to the community again. That's what the law and the evidence in this case requires. There is no other way you can look at it." And, "you as the jury, I believe you have the right to protect your community against these people." The appellants objected, the objection was sustained, and the trial court gave a curative instruction. Without objection, the prosecution went on to state:

> And if we don't impose it, it can't be imposed. It has to be done by our Constitution just like we have done it in this case. It has to be done by following the procedure. We have followed that procedure. And we can either follow the law or we can ignore the law, and I'm asking you not to ignore the law and the facts in this case and do what is appropriate under the facts and under the law.

While the last comment possibly could be construed as violating the dictates of Caldwell, it was not necessarily meant to nor gave the impression that the jury was not responsible for deciding the verdict. Regardless, the trial court gave the following instruction at the end of the sentencing hearing:

> It is now your duty to determine, within the limits prescribed by law, the penalty which shall be imposed as punishment for each defendant for each offense. . . . In arriving at this determination, you are authorized to weigh and consider any mitigating circumstances and any of the statutory aggravating circumstances which may have been raised by the evidence throughout the entire course of this trial, including the guilt finding phase or the sentencing phase or both. You the Jury, are the sole judges of the facts, and of the law as it applies to the facts in these cases.

Under Cazes and West, the error, if any, in the prosecution's argument was rendered harmless. The trial court did not endorse the state's argument, and it correctly instructed the jury before deliberation.

Next, the appellants submit that it was improper for the prosecution in its closing argument to state:

73

Murder of an innocent couple, they didn't have anything to do with the prison in Eddyville. They didn't have anything to do with law enforcement. They were just an elderly couple that were semi-helpless almost. They had retired over there on Kentucky Lake. Had a right to live in that little house that overlooked the lake and go fishing and have their grandson come down to visit with them.

[Objection overruled]

* * * *

[B]ut I believe that under the law of our land, that Mr. and Mrs. Vester, they had a right to go on living. They had the right to have been alive this Thanksgiving and had their children. They had rights. They had rights. Even though they are not alive on the face of this earth, these rights -- and our law was designed to make sure they have rights. So don't get lost in this case on what the defendants' rights are --

[Objection overruled]

* * * *

But I will tell you what, these two people that are buried over there somewhere in Stewart County have a right, too. They have a right to the protection of the law. It's too late to do them any good . . . .

In State v. Bigbee, 885 S.W.2d 797, the Supreme Court held that it was reversible error where the prosecutor reminded the jury that there had been no one there to ask for mercy for the victims and encouraged the jury to give the defendant the same consideration that he had given his victims. Id. at 812. In finding the prosecutor's argument to be improper, the Court stated that the argument "encouraged the jury to make a retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence." Id.

The prosecutor's remarks cannot be said to rise to the level of error found in Bigbee, nor did they affect the jury's sentencing decision. See also, State v. Henley, 774 S.W.2d 908, 913 (Tenn. 1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3291, 111 L. Ed. 2d 800 (1990).

Next, the appellants contend that the prosecutor wrongly expressed his personal opinion of the appellants' proof of mitigating circumstances.

During closing arguments, the prosecution made the following comments:

In fact I submit to you, we haven't heard any [mitigating circumstances]. I think the definition of mitigation goes something like to moderate in force or intensity, to alleviate or to become milder. I haven't heard anything. What has been shown in mitigation in this case? How many children in this world have been raised by parents that drink, maybe wore clothes too big for them to school? Does that mitigate what happened to Mr. and Mrs. Vester? You

74

know we asked the Defendant Quintero's uncle; well, you were brought up in a good home. One turned out to be what he described as not so good, and the others were good. That's not an excuse, ladies and gentlemen, for this type of murder. If my father died the week before I was born and I didn't have a father around, does that mitigate if I go out and slaughter somebody in their bed?

* * * *

You know what you heard in mitigation, if there was any mitigation there. First of all, I don't really know -- I have yet to hear anything that sounded to me like it would mitigate against what happened to the Vesters.

[Objection]

THE COURT: Yes, ladies and gentlemen -- I sustain that. ladies and gentlemen, an attorney cannot give his personal opinions to you, disregard it.

In State v. Payne, 791 S.W.2d 10 (Tenn. 1990), aff'd, 501 U.S. 808, 111 S.Ct. 2597, 115 L. Ed. 2d 720 (1991), our Supreme Court addressed this issue:

It is a violation of the Code of Professional Responsibility, DR 7-106(C)(4) for lawyers engaged in trial to express their personal opinion about any issue involved in the justice of the cause they represent. This Court has repeatedly condemned such conduct. See e.g. State v. Johnson, 743 S.W.2d 154, 159 (Tenn. 1987) and State v. Hicks, 618 S.W.2d 510, 516, 517 (Tenn. Crim. App. 1981). However, insofar as its effect upon Defendant's rights, it is ineffective, as well as unprofessional, and in this case was harmless beyond a reasonable doubt.

Id. at 20. The same is true here. Such error was harmless.

Moreover, it should be noted that our Supreme Court has held that it is proper for the state to argue to the jury that it should not return a life sentence based on the mitigating circumstances presented by the defendant. See State v. Howell, 868 S.W.2d 238, 258. In State v. Brimmer, 876 S.W.2d 75, the Supreme Court found that "the State's argument 'that there were no mitigating circumstances in this case and that Dr. Engum's testimony concerning the defendant should be entitled little weight' . . . did no more than set out the State's interpretation of the proof." Id. at 85. The state is entitled to argue to the jury that it should not give much weight to the mitigating evidence presented.

Finally, the appellants contend that the prosecution's characterizations of them and of the murders were highly improper and resulted in an arbitrary and unreliable sentence. Specifically, the prosecution made the remark that it was "[k]ind of like killing hogs and bleeding all over the bathroom." Appellant Quintero's objection was overruled. Later, the prosecution stated "[i]f my father died the week before I was born and I didn't

have a father around, does that mitigate if I go out and slaughter somebody in their bed?" The appellants' objections were overruled even though two such objections had been sustained during closing argument at the guilt phase of the trial. Finally, the appellants submit that it was improper for the prosecution to have stated "[i]f you found cancer in your body you would remove it," in reference to the appellants.

First, we note that the appellants failed to object to this last comment. Moreover, while the state's comments do not appear to be proper argument, we find that any error was harmless. See State v. Payne, 791 S.W.2d 10, 20.

## JURY INSTRUCTIONS AT SENTENCING PHASE[17]

The appellants contend that the jury instruction on reasonable doubt at the sentencing phase did not lend content to the moral certainty phraseology used by the trial court. Thus, they argue that there was a reasonable likelihood that the jury understood it to allow conviction based on insufficient proof in violation of the standard set forth in Cage v. Louisiana, 498 U.S. 39, 41, 111 S.Ct. 328, 329-30, 112 L. Ed. 2d 339, and Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 1247-48, 127 L. Ed. 2d 583. Specifically, the appellants assert that the trial court's instruction on moral certainty failed to provide a minimum burden of proof that it purports to define.

In this case, the trial court instructed the jury as follows:

The burden of proof is upon the State to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt and to a moral certainty.

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of your verdicts. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdicts. The law makes you, the Jury, the sole and exclusive judges of the credibility of the witnesses and the weight to be given to the evidence.

Like the charge at the guilt-innocence phase, the terms of particular concern to the United States Supreme Court were not included in the trial court's charge to the jury

---

[17]The record does not include the transcript of the jury instructions as actually given; instead, the typewritten instructions are included in the technical record.

at the sentencing phase. As cited earlier, in several cases, this Court has upheld similar instructions as consistent with constitutional principles. See Pettyjohn v. State, 885 S.W.2d 364, 365-66; State v. Hallock, 875 S.W.2d 285, 294. Moreover, our Supreme Court has held that "the use of the phrase 'moral certainty' by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt." State v. Nichols, 877 S.W.2d 722, 734. Thus, the full charge given by the trial court at the sentencing phase, although containing the phrase "moral certainty," did not violate the appellants' rights under the United States or Tennessee Constitutions.

## DOUBLE JEOPARDY CLAIM BASED ON CONVICTIONS FOR FELONY-MURDER AND UNDERLYING FELONIES

The appellants argue that their multiple convictions for felony-murder, as well as for the underlying felonies, violated the double jeopardy provisions of both the Fifth Amendment to the United States Constitution and Article I, § 10 of the Tennessee Constitution. The appellants cite Briggs v. State, 573 S.W.2d 157 (Tenn. 1978), and State v. Strouth, 620 S.W.2d 467 (Tenn. 1981), cert. denied, 455 U.S. 983, 102 S.Ct. 1491, 71 L. Ed. 2d 692 (1982).

In State v. Blackburn, 694 S.W.2d 934 (Tenn. 1985), the Supreme Court held that the imposition in a single trial of dual convictions for both felony-murder and the underlying felony does not violate the constitutional prohibitions against double jeopardy. Id. at 936-37. Our appellate courts have continued to hold that dual convictions for felony-murder and the underlying felony does not violate double jeopardy provisions. See, e.g., State v. Barber, 753 S.W.2d 659, 671; State v. Zirkle, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995); State v. Johnson, 781 S.W.2d 873, 884-85 (Tenn. Crim. App. 1989). This issue is without merit.

77

## INTERSTATE COMPACT ON DETAINERS

Appellant Hall argues that the state failed to comply with the requirements of the Interstate Compact on Detainers, T.C.A. § 40-31-101, et seq.,[18] by not granting him a speedy trial. Specifically, appellant Hall argues that once the state requested that he be returned from Kentucky pursuant to the Interstate Compact on Detainers, it was obligated to comply with all of its requirements. Therefore, appellant Hall submits that the state was not entitled to withdraw its request under the Interstate Compact on Detainers and proceed under the Uniform Criminal Extradition Act, T.C.A. § 40-9-101, et seq. Because appellant Hall was not tried within 180 days, as required by the Interstate Compact on Detainers, Art. III, he argues that the charges should have been dismissed. We find no support for appellant Hall's position.

When an accused is sought in another state for crimes committed in Tennessee, the state may initiate proceedings pursuant to the Interstate Compact on Detainers or under the Uniform Criminal Extradition Act. If a defendant is returned to Tennessee under the Interstate Compact on Detainers, the state must try the defendant within 180 days of his return to the state in which the crimes were committed. T.C.A. § 40-31-101, Art. III. The receiving state only receives temporary custody of the prisoner for the sole purpose of prosecuting any untried charges. T.C.A. § 40-31-101, Art. V.

The Interstate Compact on Detainers and the Uniform Criminal Extradition Act do not indicate that the initiation of proceedings under one automatically precludes proceedings under the other. The two Acts were adopted in Tennessee "[t]o facilitate the important duties of transferring individuals into and out of this state for trial on criminal charges, and to bring uniformity to the procedures among the several states." State ex rel. Young v. Rose, 670 S.W.2d 238, 239 (Tenn. Crim. App. 1984). The main difference between the two Acts is that the procedures under the Interstate Compact on Detainers result in merely a temporary transfer to the receiving state. Id.

---

[18]A detainer is "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking that the prisoner be held for the agency, or that the agency be advised when the prisoner's release is imminent." Fex v. Michigan, 507 U.S. 43, 113 S.Ct. 1085, 1087, 122 L. Ed. 2d 406 (1993). The purpose of the Interstate Agreement on Detainers Act is to "encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, information or complaints." T.C.A. § 40-31-101, Art. I. The purpose stems from the need to alleviate the uncertainties created by untried charges and detainers which interfere with programs of inmate treatment and rehabilitation. Edward G. Hild, The Death Penalty and the Interstate Agreement on Detainers Act: A Proposal for Change, 29 J. MARSHALL L. REV. 499, 504 (1996).

While the specific issue in the present case has not been addressed by Tennessee courts, we are persuaded by the holding in People v. Quakenbush, 687 P.2d 448 (Colo. 1984), where the court held that an agreement under the Interstate Compact on Detainers is not an exclusive method by which officials in one state may obtain custody of a defendant incarcerated in another state. Id. at 450. The Colorado court went on to find that a state retains its constitutional and statutory rights to extradite a fugitive from another state. Id. Accordingly, we find no error in the state's decision to withdraw its request under the Interstate Compact on Detainers and bring appellant Hall into Tennessee via the extradition process. Accordingly, appellant Hall's claim is without merit.

## PROPORTIONALITY REVIEW[19]

Finally, this Court is required to review death sentences in the manner mandated by T.C.A. § 39-13-206(c)(1). Here, the sentences were not imposed in an arbitrary manner. Additionally, the evidence presented in support of the valid aggravating circumstances clearly outweighed the evidence introduced to establish any mitigating circumstances beyond a reasonable doubt.

It is true that "[n]o two cases are alike, and no two defendants are alike." State v. Barber, 753 S.W.2d 659, 665. However, a comparative proportionality review, which considers both the nature of the crimes and of the appellants, reveals that the appellants' death sentences for the murder of Myrtle Vester were neither excessive nor disproportionate. See State v. Smith, 868 S.W.2d 561; State v. Harris, 839 S.W.2d 54.

## CONCLUSION

We have carefully considered the appellants' contentions as to alleged errors occurring during the guilt phase and the sentencing phase of the trial. We find that both of the appellants' contentions as to the sufficiency of the evidence and as to errors occurring during the guilt and sentencing phases are without merit. Accordingly, we affirm appellant Hall's convictions and death sentence with one modification: Count 2 of No. 10557 is merged with Count 1 of No. 10547.

---

[19]We note that the trial court failed to file a report with the Clerk of the Supreme Court in Nashville or to include one in the technical record as required by Rule 12, Tennessee Supreme Court Rules.

Likewise we affirm appellant Quintero's convictions and his death sentence with one modification:  Count 2 of No. 10544 is merged with Count 1 of No. 10527.


_____
WILLIAM M. BARKER, JUDGE


CONCUR:


_____
PAUL G. SUMMERS, JUDGE


_____
DAVID H. WELLES, JUDGE